IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
SHELBY DIVISION

| | |
|---|---|
| In re: ) | Case No. 18-40169 |
| ) | |
| SCHLETTER INC., ) | Chapter 11 |
| ) | |
|     Debtor. ) | |
| ) | |

**AFFIDAVIT OF RUSSELL SCHMIT IN SUPPORT OF DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

**I, RUSSELL SCHMIT,** hereby declare, under penalty of perjury, as follows:

1.   I am the Chief Executive Officer and President at Schletter Inc. ("Debtor"). I have more than 35 years of experience in the solar industry. I have served as CEO in several companies over the past 20 years, including solar manufacturing companies in both Europe and the U.S. I am an engineer by education, both mechanical and electrical/materials science, and am a registered Professional Engineer in the state of Arizona. I joined Schletter Inc as CEO on June 26, 2017.

2.   As CEO, I am responsible for assisting in the management of Debtor's operations, overseeing Debtor's liquidity management, and assisting with the restructuring process of Debtor. In my capacity as CEO of Debtor for nearly ten months, I am familiar with the financial affairs of all of Debtor. I perform my duties out of Debtor's headquarters located at 1001 Commerce Center Drive, Shelby, NC 28150.

3.   I submit this affidavit (the "First Day Affidavit") in support of Debtor's chapter 11 petition and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "First Day Motions").[1]

---

[1] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day Motion.

4. On April 24, 2018 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Except as otherwise indicated herein, all facts set forth in this First Day Affidavit are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of Debtor's management and Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning Debtor's operations and financial condition. I am authorized to submit this First Day Affidavit on behalf of Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.    INTRODUCTION

6. Debtor is an integrated supplier of solar racking systems. Racking systems consist of all the structural elements required for solar photovoltaic (PV) systems for a variety of applications. The primary market segments served are: (i) Ground mount - typically large, utility-scale power plants, (ii) Rooftop - residential and commercial systems, primarily flat roofs, and (iii) Carports - integrated shade structure and PV system for parking lots. Debtor is headquartered in Shelby, North Carolina and is the U.S. subsidiary of Schletter GmbH ("Schletter"), headquartered near Munich, Germany.

7. The company works closely with its customers to design and manufacture the racking systems for these applications. Schletter also provides geo-technical engineering and testing services, installation training, and other support services.

8. In the U.S., Debtor employed approximately 134 people, of which 16 were at its Tucson, Arizona office, five were remote sales people, and the rest were at its manufacturing facility in Shelby.

9. Schletter is the parent company of a global enterprise (the "Schletter Group"), of which Debtor is a part. The Schletter Group develops, produces, and distributes high quality, durable solar mounting systems. It has production facilities in Germany, China, and United States. With its international sales offices, Schletter is represented on all five continents. Schletter's headquarters is located in Kirchdorf (close to Munich), Bavaria, Germany. Schletter has strong brand recognition as a producer of innovative solar mounting solutions that are highly customizable to customers and local requirements. The principal product groups are ground mounting systems for open area installations with a short installation time and long durability (more than 20 years) as well as solar mounting systems for rooftop installations on a variety of roofs. For open area projects, the main customers are project developers and investors. Rooftop systems are distributed to wholesalers, installers, and project developers.

## II. BACKGROUND

### A. Corporate History

10. Debtor was founded in 2007 and was initially located in Tucson, Arizona. It established a production facility there, and subsequently expanded in the southeast with an office in North Carolina. A second production facility was constructed in Shelby, North Carolina and all production was consolidated from Tucson to Shelby in 2016.

11. As noted, the Schletter Group develops, produces, and distributes high quality, durable solar mounting systems, with production facilities in Germany, China, and the United States and international sales offices across the globe. Over the past several decades, Schletter has

3

been growing its operations and now runs manufacturing sites with a total production space of approximately 88,000 square meters.  Since 2008, the Schletter Group's global headquarters have been located in Kirchdorf, Germany.

**B**     **Capital and Debt Structure**

*Secured and Unsecured Debt*

12.     On February 10, 2016, Debtor entered into a Credit and Security Agreement with Midcap Financial Trust ("Midcap") as administrative agent and Lender. Midcap offered an asset based revolving loan with a commitment of $20 million.   Prior to the petition date, Midcap had ceased advancing and was collecting all cash to pay down the loan.  The principal balance of the loan was approximately $994,000 excluding interest and fees.  Midcap asserts a first priority blanket lien on all collateral of Debtor.

13.     Prior to the petition date, Hynes Industries, Inc., American Roll, Formed Products Corp., and Hynes Kokomo, LLC (collectively, "Hynes") served as a framing supplier for Debtor for certain ongoing projects.  On February 9, 2018, Hynes commenced an action against Debtor in the United States District Court for the Western District of North Carolina, Asheville Division, Civil Action No. 1:18-cv-00031 (the "Litigation") by filing a complaint styled "Verified Complaint for Recovery of Money, Appointment of Receiver and Temporary, Preliminary, and Permanent Injunctive Relief With Motion for Order of Prejudgment Attachment" (the "Complaint").  Debtor and Hynes entered into a settlement agreement on March 9, 2018.  As a result, certain prepetition offsets and transfers of receivables occurred.   Hynes received (i) a Subordinated Promissory Note in the amount of $2,367,000.00 and (ii) a Promissory Note in the amount of $2,000,000.  Hynes asserts that these notes were secured by a second priority blanket

4

Document Page 5 of 18

lien pursuant to its UCC Financing statement recorded on March 29, 2019. Debtor reserves all rights to seek avoidance of this lien pursuant to Section 5 of the Bankruptcy Code.

14. Capital Equipment Solutions has an equipment lease on certain equipment located at in North Carolina. Capital Equipment Solutions asserts a first priority lien on such specified equipment pursuant to a UCC financing statement recorded on January 22, 2016.

15. There are two landlords that each hold security deposits on the Shelby, NC and Tucson, Arizona locations.

16. In addition to prepetition claims of the lenders noted above, there is approximately $15 million in claims from employees, trade vendors, suppliers and other vendors on an unsecured basis.

### *Equity Interests*

17. Debtor's common stock is 95 percent by Schletter Beteiligungs GmH & Co. KG. It is noted that under German law it is usual to have shares authorized but not issued. Accordingly, the remaining 5 percent of shares are authorized but not owned by any party. Schletter owns 99.9% of Schletter Beteiligungs GmbH & Co. KG. On March 19, 2018, as part of Schletter's restructuring process that had commenced in 2016 to reduce costs and rationalize operations, Schletter, represented by its managing directors, initiated an insolvency debtor in possession proceeding in Germany pursuant to the German Insolvency Code (*Insolvenzeigenverwaltungsverfahren § 270a InsO*) (the "German Proceeding") against its own assets in the Amtsgericht-Mühldorf (*Local Court – Insolvency Mühldorf*) (the "German Court"). The purpose of the German Proceeding is to secure the Schletter's assets against detrimental alteration and to approve a preliminary debtor in possession operation under the German Insolvency Code. In accordance with German law, the German Court appointed Dr. Christian Gerloff as insolvency monitor (the "Insolvency Monitor")

5

and authorized him to enter Schletter's business and examine its books and business papers. The role of the Insolvency Monitor is to examine Schletter's economic situation and monitor management. During the time Schletter is operating under the supervision of the German Court and the Insolvency Monitor, Schletter is not to incur liabilities that are not part of the normal course of business without the Insolvency Monitor's consent. The German Proceeding is a debtor in possession type proceeding not unlike that available to companies under chapter 11 of the Bankruptcy Code. Thus, throughout the German Proceeding, business operations will continue at full capacity, and the Schletter Group's production, sales and service will continue without restrictions during the self-administration.

C. **Events Leading Up To The Chapter 11 Case**

18. Historically all product design and engineering was done in Germany, and the U.S. subsidiary simply manufactured and sold those products developed in Germany. However, as markets matured, the customer requirements in the U.S. diverged from those in Europe. So in 2016 Debtor's team began development of a new ground-mount system called "G-Max". This became the first product designed and produced solely by the U.S. team. It was innovating in its use of high-strength steel and its "hat" cross-section, rather than the more standard "C" or "Z" cross-sections for the structural elements.

19. Unfortunately, the U.S. team mismanaged the product introduction 2017. It had not been piloted in a field installation, and it was not ready to be manufactured in volume. The final engineering and testing had not been completed prior to the target production start date. However, large contracts had been signed with major customers for approximately 600MW ($40 million) of product. The plan was to use a subcontract manufacturer, Hynes Industries, for approximately 30% of the production to help meet demand.

6

20. As a result of late engineering changes and production ramp-up problems, Debtor shifted more of the production to Hynes than planned. Ultimately the volume of production outsourced to Hynes was almost double the planned amount. Hynes was unable to accommodate that level of production and their internal problems led to late deliveries and other issues. The combination of production problems internally, the higher costs of using Hynes, and the late deliveries to customers from both Schletter Inc and Hynes that resulted in liquidated damages and other back charges from customers led to losses of over $10 million for Debtor in 2017. Liens were filed by Hynes on the projects for which Hynes supplied components, which in turn caused those customers to stop payment of their receivables due to Debtor, resulting in the Complaint and litigation with Hynes.

21. While Hynes and Debtor did enter into a settlement agreement, as a result of the Litigation and the delays in the receivables, the revolving lender Midcap entered into an over-advance position. Subsequently, Midcap stopped all advances and began to collect all receivables to pay down its debt. As a result, all cash flow ceased and Debtor was soon in arrears with the landlords, the equipment lessor and its creditors resulting in the current filing.

**D.    Debtor's Goals in This Chapter 11 Case**

22. Starting in 2016, the Schletter Group began a restructuring process that culminated in the German Proceeding in the spring of 2018. Some of the steps taken were designed to lower overhead and logistics costs and included professionalization of the project management and evaluation of outsourcing concept. Additionally, during that time, the Schletter Group has developed a new tracker product offering. Each of these steps has been designed to improve profits and to create a framework from which the Schletter Group can transition to a profitable company

7

in the long term. The restructuring program initiated by management can be augmented by investor-specific measures and, thus, be accelerated.

23. In the German Proceeding, Schletter intends to sell the material assets of the Schletter Group, including the shares in the subsidiaries as well as additional operating entities currently held by Schletter Unternehmen GmbH & Co. KG, which in turn owns the majority of Debtor, in an orderly M&A process by way of an asset deal at the level of Schletter and share or asset deals regarding its subsidiaries as well as the additional operating entities. It is contemplated that this M&A process would include Debtor.

24. In order to pursue this sale option, Schletter has initiated a standard auction process used in German insolvency proceedings. First, Schletter engaged Ernst & Young GmbH ("E&Y") to provide advisory service related to the sale. E&Y sent a Phase I Process Letter, in which it provided a number of parties a Confidential Information Package and asked for a written, non-binding indication of interest not later than April 12, 2018. The Phase I Process Letter provided notice that on the basis of the Indications of Interest received, and at the sole discretion of the Foreign Debtor and its Insolvency Monitor, a "short list" of potential bidders will be invited to conduct a more detailed review of the Schletter Group's business. In particular, access was granted to the management of the company at a management presentation on April 26 and 27, 2018, and to an electronic data room, and there will be a possibility to conduct a visit to the company's facilities.

25. E&Y sent out a Phase II Process Letter on April 17, 2018 to the potential bidders that submitted an indication of interest in response to the Phase I Process Letter. This permits those Phase II bidders to have access to an electronic data room, submit questions related to the information in the electronic data room, and to meet with management on selected topics. The

8

Phase II Process Letter asks interested parties to submit binding offers no later than May 15, 2018, together with an asset purchase agreement acceptable to the bidder and documentation regarding available commitments to finance and pay for the obligations under the binding offer and the asset purchase agreement.

26. After receiving the binding offers, E&Y will review and discuss it with Schletter and its Insolvency Monitor in detail and determine the party or the parties for the final negotiation phase with the view to sign a definitive agreement by the end of May or beginning of June 2018 at the latest.

27. Schletter filed a petition under Chapter 15 in the United States Bankruptcy Court for the Western District of North Carolina on April 27, 2018, Case No. 18-10168, seeking recognition of the foreign proceeding and in an effort to coordinate the global proceedings.

28. Debtor intends to use this Chapter 11 Case in conjunction with the German Proceedings to pursue the global sale and an orderly wind-down of the estate. Debtor will continue operations, although on a decreased level, with key employees in order to continue the business as a going concern.

### III.    FIRST DAY MOTIONS

**A.    Motion of Debtor for Entry of Interim and Final Orders Authorizing Debtor to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations (the "Employee Wages and Benefits Motion")**

29. By the Employee Wages and Benefits Motion, Debtor seek entry of entry of interim and final orders (i) authorizing, but not directing, Debtor to (a) pay and/or perform, as applicable, prepetition obligations to current employees including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (b) maintain and continue to honor their practices, programs, and policies for their employees that

were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of Debtor's various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (c) reimburse Employees for prepetition expenses incurred on behalf of Debtor in the ordinary course of business (the "Employee Expense Obligations"); (d) continue to pay and/or contest in good faith all amounts related to workers' compensation claims that arose prepetition (the "Workers' Compensation Obligations"); (e) pay all related prepetition withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

30. As of the Petition Date, Debtor employed 134 people. However Debtor, acting as a liquidating fiduciary, sent Warn Act notices to the employees and governmental authorities on April 25, 2018. Debtor intends to keep employed approximately 16 full time employees to run the operations (the "Retained Employees"). Other employees may be brought back on an independent contractor basis as needed.

31. Debtor's Retained Employees perform a variety of critical functions, including running its business and technical operations at its manufacturing facility, performing general and administrative services, providing sales support, providing engineering support, and other related

tasks. The Retained Employees' skills, knowledge, and understanding of Debtor's operations and business relations are essential to the effective operation of Debtor's business.

32. In the ordinary course of business, Debtor incurs payroll obligations for salaries, benefits, vacation, commissions and hourly wages owed to their Retained Employees. Payroll for the Retained Employees is twice a month by direct deposit. The average total monthly inclusive payroll obligations are approximately $180,000 for the Retained Employees. As of the Petition Date, Debtor estimate that they owe $205,600.00 to their Retained Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations"). Debtor seeks the authority, but not direction, to pay and honor Prepetition Wage Obligations in an amount not to exceed $12,850 in the aggregate for Retained Employees, and to continue to honor the Employee Wage Obligations on a postpetition basis in the ordinary course of business.

33. The Retained Employees are essential to the continued operation of Debtor's business, and the Retained Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that Debtor continues, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. A loss of employee morale and goodwill at this critical juncture would undermine Debtor's stability, and undoubtedly would have an adverse effect on Debtor, their customers, the value of their assets and business, and their ability to achieve their objectives in chapter 11.

34. I believe that payment of all prepetition Employee Obligations in accordance with Debtor's prepetition business practices will enable Debtor to retain their qualified and highly-skilled employees and is in the best interests of Debtor, its estate and creditors, and all parties in interest.

CHAR2\2015856v3

**B.     Motion of Debtor for Entry of an Interim Order and Final Order Authorizing Debtor to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter Into New Policies (the "<u>Insurance Motion</u>")**

35.     By the Insurance Motion, Debtor requests entry of interim and final orders (i) authorizing Debtor to pay unpaid prepetition premiums associated with the prepetition insurance policies (collectively, the "<u>Insurance Policies</u>") to the extent that Debtor might discover and determine, in its discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the Insurance Policies.  Debtor is requesting this relief solely to the extent consistent with the terms of any interim and final orders approving entry into debtor in possession financing and authorizing use of cash collateral entered by the Court in this Chapter 11 Case.

36.     Debtor maintains Insurance Policies that have been obtained through various third-party insurance carriers (the "<u>Insurance Carriers</u>"), which provide coverage for, among other things, commercial general liability, accounts receivable, workman's compensation, property, life, disability, auto, E&O, inland marine, healthcare, dental, vision.  Continuation of the Insurance Policies is essential to the preservation of Debtor's business.  Moreover, in many cases, coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern Debtor's commercial activities.

37.     Debtors pays certain premiums on a periodic basis and others in an annual lump sum. Debtor is generally current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid.  As of the Petition Date,

CHAR2\2015856v3

Debtor estimates that a total of approximately $168,646.00 in prepetition amounts is outstanding under the Insurance Policies.

38. On April 25, 2018, Debtor notified the healthcare insurance carriers that it would be terminating the healthcare plan on June 9, 2018. All employees will be covered through this date.

39. Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition and premiums will need to be paid in the ordinary course postpetition. Many of the policies are paid on a month to month basis or will expire on a post-petition basis. Debtor is in the process of attempting to procure extensions to any policies that come to term during the Chapter 11 Case and will continue such efforts.

40. Debtor believes that the Insurance Policies are necessary and essential to the operation of its business during this Chapter 11 Case. Under the terms of the Insurance Policies, the Insurance Carriers may cancel the Insurance Policies for nonpayment upon Debtor's failure to pay the premium obligations, and such cancellation will seriously harm Debtor's ability to continue its operations and business in the ordinary course. Debtor's ability to continue its existing Insurance Policies is essential to the maintenance of its business. Accordingly, Debtor seeks authorization to maintain its existing Insurance Policies, including payment of all monthly obligations, whether prepetition or postpetition, and to renew or enter into new policies as may be required as the annual terms of existing Insurance Policies expire, without further order of the Court, in the ordinary course of business. Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of Debtor, its estate and creditors, and all parties in interest.

**C.    Debtor's Motion for Entry an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "<u>Utilities Motion</u>")**

41. In connection with the operation of its business, Debtor obtains electricity, natural gas, water, telephone and/or similar services with various utility companies (collectively, the "Utility Providers").

42. Uninterrupted utility services are essential to ongoing operations and, therefore, to the ultimate success of Debtor's reorganization. Should the Utility Providers refuse or discontinue service, even for a brief period, Debtor's business operations would be disrupted. The impact on Debtor's ability to conduct business would be significant and would jeopardize Debtor's reorganization efforts. It is therefore critical that utility services continue uninterrupted.

43. To avert disruption to its business, Debtor would be required to pay whatever amounts are demanded by the Utility Providers to avoid the cessation of necessary services. Accordingly, Debtor seeks the entry of an order prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition invoices, authorizing Debtor to pay unpaid prepetition invoices owed to the Utility Providers, deeming Utility Providers adequately assured of future performance, and establishing procedures for determining requests for additional adequate assurance of payment.

44. As of the Petition Date, Debtor estimates that a total of approximately $11,563.00 in prepetition invoices is owed to the Utility Companies. However, Debtor submits that its ability to continue paying for utility services is adequately assured for a number of reasons. First, Debtor should have adequate liquidity through its operations and cash on hand to pay for postpetition utility services on a current basis. Second, Debtor proposes to make a deposit of one month's average billing with each Utility Provider. Third, Debtor has a good payment history with each of the Utility Providers. Fourth, Debtor will continue to pay for utility services in the ordinary course of business.

45. I am advised by counsel that under the relief requested in Utilities Motion, the Utility Providers retain the right to seek additional adequate assurance.

46. Accordingly, I believe that the relief requested in the Utilities Motion is in the best interest of Debtor, its estate and its creditors.

**D.    Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 102 and 105(a) and Bankruptcy Rules 2002(m) and 9007 Establishing Case Management and Notice Procedures (the "<u>Case Management Motion</u>")**

47. By the Case Management Motion, Debtor seeks an order establishing certain notice and case management procedures, all subject to further order of the Court, including: (a) limiting the notice procedures in the Chapter 11 Case and (b) designating the parties upon whom notice must be served. Regulating the service, notice and filing requirements at the outset of this case will minimize confusion regarding such important procedural matters. Further, these proposed procedures will dramatically reduce the economic burdens on Debtor's estate.

48. Specifically, Debtor proposes that every notice, motion or application, and all briefs, memoranda, affidavits, declarations or other documents filed concurrently in support thereof in the Chapter 11 Case (collectively, the "<u>Filings</u>") and all Filings, complaints and other pleadings filed in any adversary proceeding commenced in this case shall be subject to the notice procedures described in the Case Management Motion (the "<u>Notice Procedures</u>"), unless otherwise ordered by the Court.

49. There are potentially over 580 creditors and other parties in interest involved in the Chapter 11 Case, each of which may be entitled to certain notices. Debtor expects numerous parties to file notices of appearance and requests for notices and copies of pleadings as this case proceeds.

50. Based on estimates provided by counsel, the costs associated with copying and mailing or otherwise serving all notices and motions to all creditors and parties in interest would

impose an administrative and economic burden on Debtor's estate and on creditors. Such mass mailings would be extraordinarily costly to Debtor's estate and require Debtor to divert limited resources to comply with these administrative requirements. Additionally, based on the advice of counsel, the repeated drafting and filing of motions to limit notice for each use, sale or lease of Debtor's property out of the ordinary course of business, asset sales and for various compromises and settlements, increase the administrative and economic burden on Debtor's estates.

51. I believe that adopting the Notice Procedures will substantially reduce administrative burdens and result in substantial cost savings to Debtor's estate because of the reduction of time and money Debtor will have to expend on the Filings. Adopting the Notice Procedures will also significantly reduce the administrative and economic burden placed on creditors and parties in interest when filing the Filings.

52. Accordingly, I believe that the relief requested in the Case Management Motion is in the best interest of Debtor, its estate and its creditors.

E. **Debtor's Ex Parte Motion for Extension of Time Within Which to File (A) Schedules of Assets and Liabilities; (B) Schedules of Executory Contracts and Unexpired Leases; and (C) Statement of Financial Affairs (the "Extension of Time Motion")**

53. Debtor has sought an order extending the time within which it must file its Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs (collectively, the "Schedules and Statements").

54. Debtor filed for bankruptcy protection in order to, inter alia, gain time to negotiate DIP financing and cash collateral. Prior to the Petition Date, Debtor and its representatives have focused their efforts on obtaining capital and financing. Accordingly, Debtor had little time to prepare certain materials related to the bankruptcy filing, including the Schedules and Statements. Debtor's representatives, and other parties as necessary, are actively working on reviewing and

synthesizing information from the books and records of Debtor to finalize the Schedules and Statements.

55. Debtor has a significant amount of information to accumulate in order to prepare its Schedules and Statements, but Debtor has not had ample time to accumulate such information.

56. I am advised by counsel that Debtor is required to file the Schedules and Statements within the 14-day period provided by Bankruptcy Rule 1007(c). I believe that Debtor cannot accurately complete the Schedules and Statements within this 14-day period, but estimate that an extension of 20 additional days will provide sufficient time.

**F.     Emergency Motion of Debtor for Authority to Use Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code (the "Cash Collateral Motion")**

57. Debtor has sought entry of order authorizing it to use cash collateral, on an interim basis, only to fund certain critical obligations over the next three weeks. Debtor presently has $584,435 in its postpetition bank account. Anticipated accounts receivable during the next three weeks is $326,000. Debtor is seeking emergency cash collateral of approximately $467,000 solely to pay certain critical needs it was unable to pay prepetition as it had no access to cash prior to the filing.

58. Debtor proposes to use the cash collateral in accordance with a formal budget prepared by Debtor, which is attached to the Cash Collateral Motion as Exhibit A.

59. Debtor believes it will have DIP financing in place before the three-week period is over as it currently has multiple potential DIP lenders performing due diligence on Debtor's position. As such, Debtor is only seeking cash collateral for the critical needs noted on the Budget and only for a three week period.

60. Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best interest of Debtor, its estate and its creditors.

## CONCLUSION

61.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  April 27, 2018

/s/ Russell Schmit
Russell Schmit
Chief Executive Officer and President

CHAR2\2015856v3