**IN UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCHLETTER INC., | ) | Case No. 18-40169 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**COMBINED DISCLOSURE STATEMENT**
**AND JOINT CHAPTER 11 PLAN OF LIQUIDATION**

This 11th day of September, 2020

**MOORE & VAN ALLEN PLLC**

/s/ Hillary Crabtree
Hillary B. Crabtree
N.C. State Bar No. 26500
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-3571
Telecopy: (704) 339-5968
Email: hillarycrabtree@mvalaw.com

*Attorneys for Debtor and Debtor in*
*Possession*

**JD THOMPSON LAW**

/s/ Linda W. Simpson
Linda W. Simpson
N.C. State Bar No. 12596
P.O. Box 33127
Charlotte, North Carolina 28223
Telephone: (704) 641-4359
Telecopy: (704) 943-1152
Email: lws@jdthompsonlaw.com

-and-

**LOWENSTEIN SANDLER LLP**

/s/ Jeffrey D. Prol
Jeffrey D. Prol
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (212) 262-6700
Telecopy: (212) 262-7402

*Attorneys for the Official Committee of*
*Unsecured Creditors*

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **I.** | INTRODUCTION | iii |
| **II.** | Overview of the Plan | iii |
| **III.** | DEFINITIONS AND CONSTRUCTION OF TERMS | vi |
| | **A.** Definitions | vi |
| | **B.** Interpretation; Application of Definitions and Rules of Construction | xxi |
| **IV.** | BACKGROUND | xxi |
| | **A.** Overview of the Debtor' Business | xxi |
| | **B.** The Debtor's Prepetition Capital and Debt Structure | xxii |
| | **C.** Events Precipitating the Chapter 11 Filing | xxiii |
| | **D.** The Chapter 11 Case | xxiv |
| **V.** | CONFIRMATION AND VOTING | xxxi |
| | **A.** Confirmation Procedure | xxxi |
| **VI.** | TREATMENT OF UNCLASSIFIED CLAIMS | xxxvi |
| | **A.** Administrative Expense Claims | xxxvi |
| | **B.** Professional Fee Claims | xxxvii |
| | **C.** Priority Tax Claims | xxxviii |
| | **D.** Statutory Fees | xxxviii |
| **VII.** | CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES | xxxviii |
| **VIII.** | TREATMENT OF CLAIMS AND INTERESTS | xxxix |
| | **A.** Treatment of Claims | xxxix |
| | **B.** Modification of Treatment of Claims and Interests | xlii |
| | **C.** Cramdown and No Unfair Discrimination | xlii |
| **IX.** | MEANS OF IMPLEMENTATION OF THE PLAN | xliii |
| | **A.** Post-Effective Date Governance and Dissolution of Debtor. | xliii |
| | **B.** Causes of Action. | xliv |
| | **C.** Plan Settlement and General Settlement of Claims and Interests. | xliv |
| | **D.** Plan Funding. | xlvi |
| | **E.** Vesting of Assets | xlvi |
| | **F.** Distribution Calculation. | xlvi |

| | | |
|---|---|---|
| **G.** | Accounts and Reserves. | xlviii |
| **H.** | Cancellation of Certain Instruments and Agreements. | xlix |
| **I.** | Compliance with the Asset Purchase Agreements | xlix |
| **J.** | Exemption from Certain Taxes and Fees. | xlix |
| **K.** | Preservation of Causes of Action. | l |
| **L.** | Insured Claims. | l |
| **M.** | Preservation of Privilege and Defenses. | li |
| **N.** | Books and Records. | li |
| **X.** | The Plan Administrator. | lii |
| **A.** | Appointment of the Plan Administrator | lii |
| **B.** | The Plan Administrator Agreement | lii |
| **C.** | Beneficiaries of Liquidating Debtor | liii |
| **D.** | Rights, Powers, and Duties of the Liquidating Debtor and the Plan Administrator | liii |
| **E.** | Compensation of the Plan Administrator | liv |
| **F.** | Indemnification | lv |
| **G.** | Exculpation | lv |
| **H.** | Insurance | lv |
| **I.** | Oversight Committee | lv |
| **XI.** | ADDITIONAL MEANS FOR IMPLEMENTATION | lvii |
| **A.** | Preservation of Right to Conduct Investigations | lvii |
| **B.** | Effectuating Documents and Further Transactions | lviii |
| **C.** | Authority to Act | lviii |
| **D.** | Funding of Liabilities and Distributions | lviii |
| **E.** | Investments of Cash | lviii |
| **F.** | Reporting | lix |
| **G.** | Release of Liens | lix |
| **H.** | Exemption from Securities Laws | lix |
| **I.** | Insurance Policies | lix |
| **J.** | Independent Representatives | lix |
| **K.** | Closing of the Chapter 11 Case | lix |
| **XII.** | PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT | lx |

| | | |
|---|---|---|
| **A.** | Distribution Record Date | lx |
| **B.** | Method of Payment | lx |
| **C.** | Claims Objection Deadline | lx |
| **D.** | No Distribution Pending Allowance | lx |
| **E.** | Disputed Claims Reserve | lx |
| **F.** | Distribution After Allowance | lxi |
| **G.** | Delivery of Distributions | lxi |
| **H.** | Unclaimed Distributions | lxi |
| **I.** | Set-Off | lxii |
| **J.** | Postpetition Interest | lxii |
| **K.** | Distributions After Effective Date | lxii |
| **L.** | Distributions Free and Clear | lxii |
| **M.** | Allocation of Distributions Between Principal and Interest | lxii |
| **N.** | Prepayment | lxii |
| **XIII.** | EXECUTORY CONTRACTS | lxiii |
| **XIV.** | INJUNCTION, EXCULPATION AND RELEASES | lxiii |
| **A.** | Injunction to Protect Estate Assets | lxiii |
| **B.** | Term of Injunctions or Stays | lxiv |
| **C.** | Injunction Against Interference with Plan | lxiv |
| **D.** | Exculpation | lxiv |
| **E.** | Releases | lxv |
| **F.** | Necessity and Approval of Releases and Injunctions | lxvi |
| **G.** | Compromise and Settlement of Claims, Interests and Controversies | lxvi |
| **XV.** | CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE | lxvii |
| **A.** | Conditions Precedent to Confirmation | lxvii |
| **B.** | Conditions Precedent to the Effective Date | lxvii |
| **C.** | Establishing the Effective Date | lxviii |
| **D.** | Waiver of Conditions to Confirmation and Effective Date | lxviii |
| **E.** | Effect of Failure of Conditions | lxviii |
| **XVI.** | RETENTION OF JURISDICTION | lxviii |
| **XVII.** | MISCELLANEOUS PROVISIONS | lxx |

**A.** Amendment or Modification of this Combined Joint Plan and Disclosure Statement............................................................................... lxx

**B.** Severability ............................................................................ lxx

**C.** Revocation or Withdrawal of this Combined Joint Plan and Disclosure Statement ................................................................................. lxxi

**D.** Binding Effect................................................................. lxxi

**E.** Notices .......................................................................... lxxi

**F.** Governing Law ............................................................ lxxii

**G.** Withholding and Reporting Requirements ...................... lxxii

**H.** Headings ..................................................................... lxxii

**I.** Exhibits/Schedules ........................................................ lxxii

**J.** Filing of Additional Documents .................................... lxxii

**K.** No Admissions ............................................................. lxxii

**L.** Successors and Assigns.................................................. lxxiii

**M.** Reservation of Rights.................................................... lxxiii

**N.** Inconsistency................................................................ lxxiii

**O.** Dissolution of the Creditors' Committee ....................... lxxiii

**XVIII.** RISKS AND OTHER CONSIDERATIONS............................... lxxiii

**A.** Bankruptcy Considerations............................................ lxxiii

**B.** No Duty to Update Disclosures .................................... lxxiv

**C.** Alternatives to Confirmation and Consummation of the Plan .......................... lxxv

**D.** Certain Federal Tax Consequences................................ lxxv

**XIX.** RECOMMENDATION AND CONCLUSION.......................... lxxix

## PRELIMINARY STATEMENT

Each Holder of a Claim against the Debtor entitled to vote to accept or reject the Plan should read this Combined Joint Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Combined Joint Plan and Disclosure Statement may be made, except pursuant to the terms hereof and Bankruptcy Code section 1125. If you are entitled to vote to approve the Plan, you are receiving a Ballot with your notice of this Combined Joint Plan and Disclosure Statement. The Debtor and the Creditors' Committee urge you to vote to accept the Plan.

Each Holder of an Administrative Expense, Priority Tax or Priority Non-Tax Claim against the Debtor that has been sent an Administrative/Priority Claim Consent Form pursuant to which the Debtor is seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan should read this Combined Joint Plan and Disclosure Statement in its entirety before determining whether to agree to such treatment. The treatment afforded to Holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims under this Combined Joint Plan and Disclosure Statement is only available if each such Holder agrees to such treatment. The failure of a Holder of an Administrative Expense Claim, Priority Tax Claim or Priority Non-Tax Claim to return the Administrative/Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment as required by Section 1129(a)(9), and such Holder shall receive its Pro Rata share of the Administrative Expense Claims Recovery or Priority Claims Recovery, as applicable, in accordance with the Distribution Calculation as set forth herein. The Debtor and the Creditors' Committee urge you to accept the treatment afforded to you under this Combined Joint Plan and Disclosure Statement.

This Combined Joint Plan and Disclosure Statement has been prepared in accordance with Bankruptcy Code sections 1125 and 1129, Bankruptcy Rules 3016 and 3017, and not in accordance with federal or state securities law or other applicable nonbankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against or Interests in the Debtor should evaluate this Combined Joint Plan and Disclosure Statement in light of the purpose for which it was prepared. This Combined Joint Plan and Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of this Combined Joint Plan and Disclosure Statement as to Holders of Claims against or Interests in the Debtor.

Any discussion of U.S. federal tax issues contained or referred to in this Combined Joint Plan and Disclosure Statement is not intended or written to be used, and cannot be used by Holders for the purpose of avoiding penalties that may be imposed on them under the IRC. Such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein. Taxpayers should seek advice based on their particular circumstances from an independent tax advisor.

There has been no independent audit of the financial information contained in this Combined Joint Plan and Disclosure Statement, except as expressly indicated herein. This Combined Joint Plan and Disclosure Statement was compiled from information

obtained from numerous sources believed to be accurate to the best of the Debtor's knowledge, information, and belief. This Combined Joint Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Joint Plan and Disclosure Statement. Neither this Combined Joint Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Combined Joint Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.

Any projected recoveries to Creditors set forth in this Combined Joint Plan and Disclosure Statement are based upon the analyses performed by the Debtor and their advisors. Although the Debtor and its advisors have made every effort to verify the accuracy of the information presented herein, the Debtor and its advisors cannot make any representations or warranties regarding the accuracy of the information.

Nothing stated herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party. The statements contained herein are made as of the date hereof, unless another time is specified. The delivery of this Combined Joint Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

THE DEBTOR AND THE CREDITORS' COMMITTEE BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES. THE DEBTOR AND THE CREDITORS' COMMITTEE BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASE. THE DEBTOR AND THE CREDITORS' COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN OR CONSENT TO THE TREATMENT OF YOUR CLAIM UNDER THE PLAN.

# I.    INTRODUCTION

Schletter Inc., the debtor and debtor in possession in the above captioned case pending in the United States Bankruptcy Court for the Western District of North Carolina, through its approved plan administrators, and the Creditors' Committee hereby jointly propose and are the proponents (the "**Proponents**") of this Combined Joint Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code.[1]

This Combined Joint Plan and Disclosure Statement contemplates the appointment of a Plan Administrator and the vesting of the Liquidating Debtor Assets in the Liquidating Debtor on the Effective Date.  On or as soon as practicable after the Effective Date, the Plan Administrator will fund the Liquidating Debtor Operating Reserve, wind-down the Liquidating Debtor, prepare and file final tax returns, prosecute certain Retained Causes of Action including the D&O Litigation, review and object to claims filed against the Estate, and make distributions for the benefit of Holders of various Allowed Claims in accordance with the Distribution Calculation and this Combined Joint Plan and Disclosure Statement all as more fully described herein.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section XVII.A. of this Combined Joint Plan and Disclosure Statement, the Proponents expressly reserve the right to alter, amend, or modify this Combined Joint Plan and Disclosure Statement, including the Plan Supplement, one or more times before substantial consummation thereof.

# II.    OVERVIEW OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED PROVIDED LATER IN THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT.

The Combined Joint Plan and Disclosure Statement is a plan of liquidation, pursuant to which the net proceeds of the 363 Sale and the disposition of other assets of the Debtor, including the Retained Causes of Action, are being pooled and distributed, to Holders of Allowed Claims.  Holders of Secured Claims, if any, are Unimpaired and have received the net proceeds of the 363 Sale in full satisfaction of their claims or will have their collateral abandoned to them. Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims and the Allowed Hynes Unsecured Claim are Impaired and each Holder will receive distributions from the proceeds of the Liquidating Debtor Assets, to the extent available, until exhausted in accordance with the terms of the Plan Settlement set forth in Section IX.C. of this Combined Joint Plan and Disclosure Statement; provided, such distributions shall be subject to the Plan Administrator first paying in full all Liquidating Debtor

---

[1]    Capitalized terms used but not defined in this Introduction have the meanings ascribed to them in Section II of this Combined Joint Plan and Disclosure Statement.

Operating Expenses and/or funding the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate.  Any Equity Interests in Debtor are Impaired and will not receive a distribution.

The Liquidating Debtor will be funded with cash on hand as of the Effective Date. The 363 Sale resulted in net proceeds to the Estate of approximately $330,000.[2]  The Plan Administrator intends to pursue Retained Causes of Actions after the Effective Date to potentially fund distributions to creditors.  The Debtor and the Creditors' Committee believe there is value in pursuing the Retained Causes of Action that will benefit the Estate and Creditors.

Generally, holders of allowed administrative or priority claims are entitled to be paid in full as a condition of approval of a plan.  However, holders of administrative and priority claims can agree to "different treatment" for such claim and such agreement can enable a debtor to confirm a chapter 11 plan.

The Debtor estimates, based on the assumptions set forth herein, that the amount of Liquidating Debtor Net Distributable Assets available to pay Holders of certain claims, including Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, as of the Effective Date, will be between $215,000 and $230,000.  As a result, there will be insufficient funds available to pay Holders of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims in full on the Effective Date.  Moreover, Holders of Priority Tax Claims and Priority Non-Tax Claims would be entitled to share in the Liquidating Debtor Net Distributable Assets if and only if there is any such Assets remaining after satisfying all Allowed Administrative Expense Claims.  Therefore, unless such Holders of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims agree to a "different treatment" than what is normally contemplated by the Bankruptcy Code, the Debtor will be unable to confirm this Plan and make the distributions contemplated thereunder.

This Combined Joint Plan and Disclosure Statement incorporates a Plan Settlement set forth in Section IX.C. below that resolves numerous debtor-creditor issues to achieve an economic resolution of Claims against the Debtor and an efficient resolution of this Chapter 11 Case, including, among other things, the settlement of a number of potential issues such as allocation of Assets and expenses among the Estate as set forth in the Distribution Calculation set forth in Section IX.F below.

Pursuant to the Plan Settlement and the Distribution Calculation discussed in greater depth below, Holders of Allowed Administrative Expense Claims will receive the Debtor Net Distributable Assets on the Effective Date and the first $500,000 of net litigation recoveries received by the Plan Administrator after the payment of certain expenses.  Holders of Allowed Priority Tax Claims, Holders of Allowed Priority Non-Tax Claims and Holders of Allowed Unsecured Claims would not receive any recovery until all Allowed Administrative Expense Claims are paid in full under the Bankruptcy Code's priority scheme.  Under this Plan, Holders of Allowed Priority Tax Claims and Holders of Allowed Priority Non-Tax Claims will share sixty-five percent (65%) of the second $500,000 of net litigation recoveries with the Holders of Allowed Administrative Expense Claims, with the remaining thirty-five percent (35%) to be distributed to

---

[2] NTD – update upon filing.

Holders of Allowed Unsecured Claims.[3]  Amounts payable to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will be split with eighty percent (80%) paid to Holders of Allowed Administrative Expense Claims and twenty percent (20%) to Holders of Allowed Priority Tax Claims and Holders of Allowed Priority Non-Tax Claims.

Any net litigation recoveries in excess of $1 million will be divided with fifty percent (50%) to be distributed to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims and fifty percent (50%) to Holders of Allowed Unsecured Claims.  Amounts payable to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will again be split with eighty percent (80%) paid to Holders of Allowed Administrative Expense Claims and twenty percent (20%) paid to Holders of Allowed Priority Tax Claims and Holders of Allowed Priority Non-Tax Claims.

If any Claim is paid in full prior to the Final Distribution, the Holder of such Claim will not be entitled to any further distributions under this Combined Joint Plan and Disclosure Statement.

**All known Holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims will be sent an Administrative/Priority Claim Consent Form pursuant to which the Debtor is seeking the affirmative agreement of such party to the treatment afforded to such Holder under this Combined Joint Plan and Disclosure Statement.  The treatment afforded to Holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims under the Plan is only available if each such Holder agrees to such treatment.  The failure of a Holder of an Administrative Expense Claim, Priority Tax Claims or Priority Non-Tax Claims to return the Administrative/Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment as required by Section 1129(a)(9), and such Holder shall receive its distribution in accordance with the Distribution Calculation.**

If an administrative or priority creditor does not accept its treatment under the Plan or objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtor may not be able to confirm the Plan.  If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Debtor and the Creditors' Committee may determine (i) to delay the Effective Date until such time as the Debtor has received Distributable Assets sufficient to pay all Administrative Expense Claims, Priority Tax Claims and/or Priority Non-Tax Claims in full in cash or (ii) to have this Combined Joint Plan and Disclosure Statement act as a motion seeking dismissal of the Chapter 11 Case in accordance with the Bankruptcy Code.  **It is likely that Holders of Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims would receive a smaller distribution on account of such Claims under any alternative to the Plan and that a**

---

[3]    Any distributions on account of the Allowed Hynes Unsecured Claim under this Combined Joint Plan and Disclosure Statement shall be subject to the partial subordination of the Allowed Hynes Unsecured Claim to all other Class 3 Allowed General Unsecured Claims as set forth in Section VIII.A.5. of this Combined Joint Plan and Disclosure Statement.

**substantial delay in such distributions would result. The Debtor and the Creditors' Committee therefore urge you to agree to support (and not object to) the Plan and thereby agree to "different treatment" contemplated under the Bankruptcy Code.**

Set forth below is a table summarizing the classification and treatment of Claims and Equity Interests under this Combined Joint Plan and Disclosure Statement and the estimated distributions to be received by the Holders of such Claims and Equity Interests under the Distribution Calculation. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class and the extent of Liquidating Debtor Net Distributable Assets ultimately available for distribution.

| DESCRIPTION/CLASS | STATUS | VOTING RIGHTS | ESTIMATED DISTRIBUTION (%) |
|---|---|---|---|
| Administrative Expense Claims | Unclassified | Not Entitled to Vote | 13.9% - 100% |
| Priority Tax Claims | Unclassified | Not Entitled to Vote | 0% - 100.0% |
| Class 1 Priority Non-Tax Claims | Impaired/ Unimpaired | Not Entitled to Vote (Deemed to Accept /Reject) | 0% - 100.0% |
| Class 2 Secured Claims | Unimpaired | Not Entitled to Vote | 100.0% |
| Class 3 General Unsecured Claims | Impaired | Entitled to Vote | 0% - 9.0% |
| Class 4 Allowed Hynes Unsecured Claim | Impaired | Entitled to Vote | 0% |
| Class 5 Equity Interests | Impaired | Not Entitled to Vote | Cancelled – 0% |

## III.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**363 Sale**" means the sales of substantially all of the Debtor's Assets as set forth in, and in accordance with, the 363 Sale Documents.

2.    "**363 Sale Agreement**" means that certain Asset Purchase Agreement by and among Schletter Inc., as seller, and Schletter International B.V. as buyer, dated as of June 12, 2018, together with all schedules and exhibits thereto, as the same may be amended, modified, or supplemented from time to time.

3.    "**363 Sale Documents**" means the 363 Sale Agreement, the 363 Sale Order, and all documents, instruments, and agreements executed and delivered in connection therewith.

4.      "**363 Sale Motion**" means the *Motion for Orders Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002 and 6004 (A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Scheduling Sale Hearing Date and (IV) Approving the Form and Manner of Notice of the Sale Hearing and (B) Authorizing and Approving (I) Sale of Certain Assets Free and Clear of Liens, Claims and Encumbrances and (II) Assumption and Assignment of Executory Contracts in Connection Therewith*, which the Debtor Filed on the June 6, 2018 [Docket No. 142].

5.      "**363 Sale Order**" means the *Order (I) Authorizing and Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (II) Authorizing and Approving Certain Distributions of Sale Proceeds and the Assumption and Assignment of Executory Contracts; and (III) Granting Related Relief*, entered by the Bankruptcy Court on July 3, 2018 [Docket No. 219].

6.      "**Acquired Assets**" means all Assets transferred, conveyed, sold, and assigned by the Debtor to the Purchaser under and in connection with the consummation of the 363 Sale under the 363 Sale Documents, which are set forth in more detail in the 363 Sale Agreement.

7.      "**Administrative Bar Date Order**" means that certain *Order Granting Joint Motion of the Debtor and Unsecured Creditors' Committee for an Order (I) Establishing Deadline for Filing Administrative Claims Incurred On or Before July 3, 2018, And (Ii) Approving the Form and Manner of Notice Thereof* [Docket No. 266].

8.      "**Administrative Expense Claim**" means any Claim for an expense of administration of the Chapter 11 Cases arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under Section 330(a) or 331 of the Bankruptcy Code; (c) all obligations designated as Allowed Administrative Expense Claims pursuant to an order of the Bankruptcy Court; (d) administrative claims that were timely filed prior to the First Administrative Claims Bar Date or the Second Administrative Expense Claim Bar Date, as applicable; (e) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date; and (f) the Stipulated Administrative Expense Settlement Claims.

9.      "**Administrative/Priority Claim Consent Form**" means the consent form, substantially in the form attached as Exhibit F to the Disclosure Statement Order to be sent to all known Holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims pursuant to which the Debtor is seeking the affirmative agreement of such Holders to the treatment afforded under Combined Joint Plan and Disclosure Statement.

10.      "**Administrative Expense Claims Recovery**" means the assets distributed from the Liquidating Debtor Net Distributable Assets to the Holders of Allowed Administrative Expense Claims pursuant to the Distribution Calculation set forth in Section IX.F. of this Combined Joint Plan and Disclosure Statement.

11.    "**Allowed**" means, with respect to Claims: (a) any Claim, proof of which was timely Filed (or for which Claim, under this Combined Joint Plan and Disclosure Statement, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no Proof of Claim has been Filed; or (c) any Claim expressly allowed pursuant to this Combined Joint Plan and Disclosure Statement or a Final Order of the Bankruptcy Court; provided that any Claim described in clauses (a) and (b) shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period fixed by this Combined Joint Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such objection is interposed and the Claim is subsequently Allowed by a Final Order; provided, further, that Claims Allowed solely for purposes of voting on this Combined Joint Plan and Disclosure Statement pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.  An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law.  Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Case is not an Allowed Claim.  Unless otherwise specified in this Combined Joint Plan and Disclosure Statement, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from and after the Petition Date.

12.    "**Allowed Hynes Secured Claim**" means $950,000 set forth in Section IV.D.7. of this Combined Joint Plan and Disclosure Statement.

13.    "**Allowed Hynes Unsecured Claim**" means the Unsecured Claim Allowed in favor of Hynes in the amount of $4,000,000 pursuant to the Hynes Settlement Agreement.  The Allowed Hynes Unsecured Claim is partially subordinated to Allowed Unsecured Claims as set forth in Section VIII.A.5. hereof.

14.    "**Allowed Midcap Secured Claim**" means $1,149,334 after allocation of all adequate protection payments set forth in Section IV.D.7. of this Combined Joint Plan and Disclosure Statement.

15.    "**Arizona Landlord**" means NTBC Trust Partners LLC.

16.    "**Arizona Lease**" means that certain Modified Gross Multi-Tenant Industrial Lease dated as of November 28, 2018 by and between the Debtor and the Arizona Landlord.

17.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtor and the Estate within the meaning of section 541 of the Bankruptcy Code.

18.    "**Avoidance Actions**" means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estate under chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code sections 506(d), 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, or 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including,

without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions; <u>subject</u>, <u>however</u>, to any releases thereof provided in this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, or any other Final Order of the Bankruptcy Court.

19.    "**<u>Ballot</u>**" means the ballot on which each Holder of a Claim entitled to vote on the acceptance or rejection of this Combined Joint Plan and Disclosure Statement casts such vote.

20.    "**<u>Bankruptcy Administrator</u>**" means the Office of the United States Bankruptcy Administrator for the Western District of North Carolina.

21.    "**<u>Bankruptcy Code</u>**" means title 11 of the United States Code, <u>11 U.S.C. §§ 101</u>, *et seq*.

22.    "**<u>Bankruptcy Court</u>**" or "**<u>Court</u>**" means the United States Bankruptcy Court for the Western District of North Carolina, having jurisdiction over the Chapter 11 Case, or if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the Western District of North Carolina.

23.    "**<u>Bankruptcy Rules</u>**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

24.    "**<u>Beneficiary</u>**" means, with respect to the Liquidating Debtor, any Holder of an Allowed Claim that may, or that is entitled to, receive a Distribution from the Liquidating Debtor under the terms hereof.

25.    "**<u>Bid Procedures Order</u>**" means the *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All Assets of the Debtor; (II) Scheduling an Auction and Hearing to Consider the Sale of Assets; and (III) Approving the Form and Manner of Notice Thereof* entered by the Bankruptcy Court on June 11, 2018 [Docket No. 170].

26.    "**<u>Business Day</u>**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

27.    "**<u>Cash</u>**" means legal tender of the United States of America and equivalents thereof.

28.    "**<u>Cash Collateral Orders</u>**" means, collectively, that certain Interim Order Authorizing Use of Cash Collateral [Docket No. 58]; Consent Order Authorizing Second Interim Use of Cash Collateral [Docket No. 98]; Consent Order Authorizing Third Interim Use of Cash Collateral [Docket. No. 108]; Fourth Interim Order Authorizing Use of Cash Collateral [Docket No. 161]; and Fifth Interim Order Authorizing Use of Cash Collateral [Docket No. 185] as set forth in Section IV.D.5. of this Combined Joint Plan and Disclosure Statement...

29.    "**Causes of Action**" means all claims, actions (including the Avoidance Actions), causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or the Estate against any Person, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, and any and all commercial tort claims against any Person; and subject, however, to any releases provided in this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, or any other Final Order of the Bankruptcy Court.

30.    "**CES**" means Capital Equipment Solutions, LLC (as successor to Loeb Financial Services, LLC).

31.    "**CES Lease**" means that certain Equipment Lease Agreement (Lease No. 92808) dated as of February 11, 2016 by and among the Debtor and Capital Equipment Solutions, LLC (as successor to Loeb Financial Services, LLC).

32.    "**Chapter 11 Case**" means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor, styled as *Schletter Inc.*, which is administered under Case No. 18-40169 and currently pending in the Bankruptcy Court.

33.    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

34.    "**Claims Objection Deadline**" means the date that is one-hundred twenty (120) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

35.    "**Class**" means any group of substantially similar Claims or Interests classified by this Combined Joint Plan and Disclosure Statement pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

36.    "**Clerk**" means the clerk of the Bankruptcy Court.

37.    "**Collateral**" means any property or interest in property of the Debtor or the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to any Avoidance Action or otherwise waived.

38.    "**Combined Joint Plan and Disclosure Statement**" or "**Plan**" means this combined disclosure statement and joint chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time through the Effective Date.

39.    "**Committee Professional**" means any professional person employed by the Creditors' Committee in the Chapter 11 Case pursuant to section 327, 363, or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court.

40.    "**Creditor**" means any Person that is the Holder of an Allowed Claim against the Debtor.

41.    "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Bankruptcy Administrator in the Chapter 11 Case.

42.    "**D&O Insurer**" has the meaning set forth in Section IV.D.14. of this Combined Joint Plan and Disclosure Statement.

43.    "**D&O Litigation**" has the meaning set forth in Section IV.D.14. of this Combined Joint Plan and Disclosure Statement.

44.    "**Ds&Os**" has the meaning set forth in Section IV.D.14. of this Combined Joint Plan and Disclosure Statement.

45.    "**Debtor**" means Schletter Inc.

46.    "**Debtor in Possession**" means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

47.    "**Debtor Professional**" means any professional person employed by the Debtor in the Chapter 11 Case pursuant to section 327, 363, or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court.

48.    "**Disclosure Statement Order**" means the *Order [NAME OF DISCLSURE STATEMENT ORDER]*, entered by the Bankruptcy Court on _____, 2020 [Docket No. _____].

49.    "**Disputed**" means any Claim that is or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated, or which is objected to in whole or in part prior to the Claims Objection Deadline and has not been allowed in whole or in part by settlement or Final Order.

50.    "**Disputed Claims Reserve**" has the meaning set forth in Section XII.E. of this Combined Joint Plan and Disclosure Statement.

51.    "**Distribution**" means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, or Beneficiaries, as applicable, under or pursuant to this Combined Joint Plan and Disclosure Statement and/or the Plan Administrator Agreement.

52.    "**Distribution Calculation**" means the allocation of the Liquidating Debtor Assets to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, and the Allowed Hynes Unsecured Claim as set forth in Section IX.F. of this Combined Joint Plan and Disclosure Statement.

53.    "**Distribution Date**" means one or more of the Initial Distribution Date, Interim Distribution Dates and/or Final Distribution Date.

54.    "**Distribution Record Date**" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

55.    "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

56.    "**Effective Date**" means the date on which the conditions specified in Section XV.B. of this Combined Joint Plan and Disclosure Statement have been satisfied or waived and the transactions contemplated hereunder have been consummated.

57.    "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

58.    "**Equity Interests**" any equity interest in any Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

59.    "**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case, including all of the Debtor's Assets.

60.    "**Estate Assets**" has the meaning set forth in Section XIV.A. of this Combined Joint Plan and Disclosure Statement.

61.    "**Exculpated Parties**" means the Debtor, the Debtor Professionals, the Independent Representatives, the Creditors' Committee and members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), and the Committee Professionals.

62.    "**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtor and any other Person or Persons.

63.    "**Executory Contract Bar Date**" means September 10, 2018 set forth in Section IV.D.12. of this Combined Joint Plan and Disclosure Statement.

64.    "**File**", "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

65.    "**Final Distribution**" has the meaning set forth in Section IX.F.3. of this Combined Joint Plan and Disclosure Statement.

66.    "**Final Distribution Date**" has the meaning set forth in Section IX.F.3. of this Combined Joint Plan and Disclosure Statement.

67.    "**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order shall not cause such order not to be a Final Order.

68.   "**First Administrative Expense Claim Bar Date**" means September 10, 2018 for all holders of Administrative Expense Claims that arose prior to July 3, 2018 and were subject to filing such Claims pursuant to the Administrative Bar Date Order.

69.   "**First Day Motions**" has the meaning set forth in Section IV.D.1. of the Combined Joint Plan and Disclosure Statement.

70.   "**General Bar Date**" means July 3, 2018.

71.   "**General Unsecured Claim**" means any Claim against the Debtor that arose or is deemed or determined by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) a Secured Claim, (ii) an Administrative Expense Claim, (iii) a Priority Tax Claim, (iv) a Priority Non-Tax Claim or any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, (v) a Allowed Hynes Unsecured Claim; or (v) any Claim that constitutes an Interest.

72.   "**German Court**" means the Amtsgericht-Mühldorf (*Local Court – Insolvency Mühldorf*)

73.   "**German Proceeding**" means that certain insolvency debtor in possession proceeding in Germany initiated by Schletter represented by its managing directors pursuant to the German Insolvency Code (*Insolvenzeigenverwaltungsverfahren § 270a InsO*) against its own assets in the German Court.

74.   "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

75.   "**Governmental Unit Bar Date**" means October 22, 2018.

76.   "**Holder**" means the legal or beneficial holder of any Claim or Interest.

77.   "**Hynes**" means, collectively, Hynes Industries, Inc., American Roll, Formed Products Corp., and Hynes Kokomo, LLC.

78.   "**Hynes Adversary Proceeding**" means that certain adversary proceeding commenced by the Debtor against Hynes in the United States Bankruptcy Court for the Western District of North Carolina, Case No. 18-03041.

79.   "**Hynes Agreed Payment**" means the $475,000 payment the Purchaser made to Hynes at the close of the 363 Sale as set forth in Section IV.D.7. of this Combined Joint Plan and Disclosure Statement.

80.   "**Hynes Carve-Outs**" means a $237,500 carve-out payment for professional fees incurred by the Debtor and a $237,500 carve-out for professional fees incurred by the Creditors' Committee as set forth in Section IV.D.7. of this Combined Joint Plan and Disclosure Statement.

81.   "**Hynes Litigation**" means that certain litigation commenced by Hynes against the Debtor in the United States District Court for the Western District of North Carolina, Asheville

Division, Civil Action No. 1:18-cv-00031 by filing a complaint styled "Verified Complaint for Recovery of Money, Appointment of Receiver and Temporary, Preliminary, and Permanent Injunctive Relief With Motion for Order of Prejudgment Attachment".

82.    "**Hynes Settlement Agreement**" means that certain settlement agreement entered into on March 9, 2018 resolving the Hynes Litigation.

83.    "**Indemnified Parties**" has the meaning set forth in Section X.F. of this Combined Joint Plan and Disclosure Statement.

84.    "**Independent Representatives**" means Carol Black and Janice Wiebelhaus in their capacities as independent representative for the Debtor as appointed pursuant to the *Order Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code Authorizing the Debtor to Engage Carol Black and Janice Weibelhaus as Independent Representatives of the Debtor* [Docket No. 279].

85.    "**Initial Distribution**" has the meaning set forth in Section IX.D.1. of this Combined Joint Plan and Disclosure Statement.

86.    "**Initial Distribution Date**" has the meaning set forth in Section IX.D.1. of this Combined Joint Plan and Disclosure Statement.

87.    "**Insurance Policies**" means all insurance policies of the Debtor.

88.    "**Interest**" means any equity or membership interest in any Debtor.

89.    "**Interim Distribution**" has the meaning set forth in Section IX.D.2. of this Combined Joint Plan and Disclosure Statement.

90.    "**Interim Distribution Date**"; has the meaning set forth in Section IX.D.2. of this Combined Joint Plan and Disclosure Statement.

91.    "**IRC**" means the Internal Revenue Code of 1986, as amended.

92.    "**IRS**" means the Internal Revenue Service.

93.    "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

94.    "**Liquidating Debtor**" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

95.    "**Liquidating Debtor Assets**" means (i) the Liquidating Debtor Funding Amount, (ii) the Retained Causes of Action, (iii) all other Recoveries and (iv) all other Assets (including any Cash) of the Debtor and the Estate as of the Effective Date, but specifically excluding (a) all Acquired Assets, and (b) any Causes of Action or Claims released, sold or assigned pursuant to

the terms of this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, or any other Final Order of the Bankruptcy Court.

96.    "**Liquidating Debtor Funding Amount**" means all of Cash held by the Liquidating Debtor on the Effective Date to be used to (i) fund litigation of Retained Causes of Action assigned to the Liquidating Debtor, (ii) fund the Liquidating Debtor Operating Reserve as necessary or appropriate to pay all Liquidating Debtor Operating Expenses, (iii) and make Distributions to Beneficiaries in accordance with this Combined Joint Plan and Disclosure Statement.

97.    "**Liquidating Debtor Net Distributable Assets**" means, all of the Cash held by the Liquidating Debtor on each Distribution Date less any amounts necessary to fund the Liquidating Debtor Operating Reserve.

98.    "**Liquidating Debtor Operating Budget**" means budget for the payment of the Liquidating Debtor Operating Expenses as approved in the Plan Confirmation Order and as may be modified in accordance with the terms of this Combined Joint Plan and Disclosure Statement. The Liquidating Debtor Operating Budget is attached as **Exhibit A** to this Combined Joint Plan and Disclosure Statement.

99.    "**Liquidating Debtor Operating Expenses**" means the overhead and other operational expenses of the Liquidating Debtor including, but not limited to, (i) reasonable compensation for the Plan Administrator in accordance with the Plan Administrator Agreement, (ii) costs and expenses incurred by the Plan Administrator in administering the Liquidating Debtor, (iii) Statutory Fees that may become payable after the Effective Date to the Bankruptcy Administrator, and (iv) any fees and expenses payable to the Plan Administrator Advisors.

100.    "**Liquidating Debtor Operating Reserve**" means the reserve established on the Effective Date by the Plan Administrators from the Liquidating Debtor Funding Amount deemed necessary by the Plan Administrators to satisfy certain anticipated Liquidating Debtor Operating Expenses other than Interim Distribution Reserve, in an amount not to exceed $117,000.00.

101.    "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina, as amended from time to time.

102.    "**Midcap**" means Midcap Financial Trust.

103.    "**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the Docket.

104.    "**OC Indemnified Parties**" has the meaning set forth in Section X.I.5. of this Combined Joint Plan and Disclosure Statement.

105.    "**Other Recoveries**" mean net recoveries from any other asset disposition(s) and/or receipt(s) of additional Cash by the Estate or the Liquidating Debtor, as may be allocated pursuant to the Distribution Calculation.

106.    "**Oversight Committee**" has the meaning set forth in Section X.I.1. of this Combined Joint Plan and Disclosure Statement.

107.    "**Person**" means an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a governmental unit or any agency or subdivision thereof or any other entity.

108.    "**Petition Date**" means April 24, 2018, the date on which this Chapter 11 Case was commenced.

109.    "**Plan Administrator**" means the Person selected by the Creditors' Committee, in consultation with the Debtor, and identified in the Plan Supplement and approved by the Bankruptcy Court pursuant to the Plan Confirmation Order to administer the Plan in accordance with the terms of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

110.    "**Plan Administrator Agreement**" means the agreement by and among the Debtor, the Liquidating Debtor and the Plan Administrator, in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, which acceptance shall not be unreasonably withheld, specifying the rights, duties and responsibilities of the Plan Administrator under this Combined Joint Plan and Disclosure Statement and providing that the Plan Administrator may retain Plan Administrator Advisors.  The Plan Administrator Agreement shall be consistent with this Combined Joint Plan and Disclosure Statement (to the extent applicable) and filed with the Plan Supplement.

111.    "**Plan Administrator Advisors**" means any firm(s) or individual(s) retained by the Plan Administrator to serve as the Plan Administrator's legal counsel or provide other professional services in connection with the performance of the Plan Administrator's duties and responsibilities under this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement.

112.    "**Plan Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Plan Confirmation Order on the Docket.

113.    "**Plan Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider approval and confirmation of this Combined Joint Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

114.    "**Plan Confirmation Order**" means an order entered by the Bankruptcy Court approving and confirming this Combined Joint Plan and Disclosure Statement under sections 1125 and 1129 of the Bankruptcy Code.

115.    "**Plan Documents**" means this Combined Joint Plan and Disclosure Statement, the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing.

116.    "**Plan Settlement**" means the settlement set forth in Section IX.C. of this Combined Joint Plan and Disclosure Statement.

117. "**Plan Supplement**" means the appendix of schedules and exhibits to be Filed at least ten (10) days prior to the Plan Confirmation Hearing containing, among other things, the Plan Administrator Agreement, as may be amended, modified, and/or supplemented.

118. "**Plan Termination Date**" has the meaning set forth in Section IX.F.3. of this Combined Joint Plan and Disclosure Statement.

119. "**Priority Claims Recovery**" means the assets distributed from the Liquidating Debtor Net Distributable Assets to the Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims pursuant to the Distribution Calculation set forth in Section IX.F. of this Combined Joint Plan and Disclosure Statement.

120. "**Priority Non-Tax Claim**" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), other than a Priority Tax Claim or an Administrative Expense Claim.

121. "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

122. "**Pro Rata Share**" means, with respect to any Distribution on account of any Allowed Claim, the ratio that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in the same Class.

123. "**Professional**" means any professional person employed by the Debtor or the Creditors' Committee in the Chapter 11 Case pursuant to section 327, 363, or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court.

124. "**Professional Fee Claim**" means a Claim under Bankruptcy Code Sections 328, 330(a), 331 or 503 for compensation of a Professional or Entity for services rendered or expenses incurred in the Chapter 11 Cases, provided that, a Professional Fee Claim shall not include an Claims for professional fees that are satisfied out of the Hynes Carve-Outs.

125. "**Professional Fee Claims Bar Date**" means thirty (30) days after the Confirmation

126. "**Proponents**" has the meaning set forth in Section I of this Combined Joint Plan and Disclosure Statement.

127. "**Purchaser**" means Schletter International B.V.

128. "**Recovery**" or "**Recoveries**" means a recovery or recoveries from the Retained Causes of Action or Other Recoveries (after the payment of any contingency fees).

129. "**Rejected Contracts**" has the meaning set forth in Section IV.D.12. of this Combined Joint Plan and Disclosure Statement.

130. "**Rejection Damages Claim**" means any Claim under section 502(g) of the Bankruptcy Code arising from, or relating to, the rejection of an Executory Contract pursuant to

section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected employment contract or unexpired lease, by section 502(b) of the Bankruptcy Code.

131.    "**Rejection Order**" has the meaning set forth in Section IV.D.12. of this Combined Joint Plan and Disclosure Statement.

132.    "**Released Parties**" means the Debtor, the Independent Representatives, the Debtor Professionals, the Creditors' Committee and members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), and the Committee Professionals.

133.    "**Retained Avoidance Actions**" means all Avoidance Actions not (a) purchased by and transferred to the Purchaser under the 363 Sale Documents, or (b) released by this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, or any other Final Order of the Bankruptcy Court, including, without limitation, claims against any and all parties, that are identified on the Debtor's statements of financial affairs as having received a transfer within 90 days of the Petition Date.

134.    "**Retained Causes of Action**" means the all of the Debtor's Causes of Action, including without limitation, the D&O Litigation and the Retained Avoidance Actions, that have not been otherwise released or transferred pursuant to this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, or any other Final Order of the Bankruptcy Court.

135.    "**Schedules**" means the schedules of assets and liabilities and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules or statements may be amended or supplemented from time to time.

136.    "**Schletter**" means Schletter GmbH.

137.    "**Schletter Group**" means a global enterprise of Schletter, of which the Debtor is a part.

138.    "**Scope Ruling**" means the Department of Commerce's scope ruling issued on August 10, 2020 in response to the Debtor's Scope Ruling Request (Case nos. A-570-967/C-570-968).

139.    "**Scope Ruling Request**"  means Debtor's request for a scope ruling with respect to certain grounding clamps under the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China, which was initially submitted on February 23, 2018, and Schletter's response to the Department of Commerce' supplemental questionnaire, which was submitted on November 13, 2019 (Case nos. A-570-967/C-570-968).

140.    "**Second Administrative Expense Claim Bar Date**" means the applicable last date set by the Bankruptcy Court for a Holder of an Administrative Expense Claim to file a request for payment of any Administrative Expense Claim that arose (i) between the Petition Date and the Effective Date for any Holders of Administrative Expense Claims not subject to the Administrative Bar Date Order, and (ii) between July 4, 2018 and the Effective Date for any

Holders of Administrative Expense Claims subject to the Administrative Bar Date Order.  The Administrative Claims Bar Date shall be thirty (30) days after the Effective Date.

141.    "**Secured Claim**" means a Claim (i) that is secured by a Lien on any Assets, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of the Creditor of setoff against amounts owed to the Debtor; (ii) to the extent of the value of the Holder's interest in the Estate's interest in such Assets or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which (A) is undisputed by the Debtor or (B) if disputed by the Debtor, such dispute is settled by written agreement between the Debtor or the Plan Administrator and the Holder of such Claim or determined, resolved, or adjudicated by Final Order.

142.    "**Shelby Landlord**" means Gilbert North Carolina, LLC.

143.    "**Shelby Lease**" means that certain Air Commercial Real Estate Association Standard Industrial / Commercial Single Tenant Lease – Net dated September 11, 2015, by and between the Debtor and Shelby Landlord for real property and improvements located in Shelby, NC.

144.    "**Statutory Fees**" means any and all fees payable to Bankruptcy Administrator pursuant to section 1930 of title 28 of the United States Code.

145.    "**Stipulated Administrative Expense Settlement Claims**" means Allowed Administrative Expense Claims, held by (i) the WARN Act Claimants, pursuant to 11 U.S.C. §§ 503(b)(1)(A) or any other applicable provision of the Bankruptcy Code, in the amount of $355,000.00, as stipulated by and among the Debtor, the Creditors' Committee, and the WARN Act Claimants in connection with and as a component of the Plan Settlement, as discussed in Sections IV.D.9. and IX.C. of this Combined Joint Plan and Disclosure Settlement; (ii) CES, pursuant to 11 U.S.C. §§ 365(d)(3) and 503, or any other applicable provision of the Bankruptcy Code, in the amount of $155,000.00; (iii) the Arizona Landlord, pursuant to 11 U.S.C. §§ 365(d)(3) and 503, or any other applicable provision of the Bankruptcy Code, in the amount of $8,134.90, as stipulated by and among the Debtor, the Creditors' Committee, and the Arizona Landlord in connection with and as a component of the Plan Settlement, as discussed in Sections IV.C.3. and IX.C. of this Combined Joint Plan and Disclosure Settlement.

146.    "**Tariff Claim**" means that certain U.S. Customs and Border Protection filed proof of claim in the amount of  $437,899.46 (Claim no. 210).

147.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

148.    "**Unclaimed Distribution Deadline**" means ninety (90) days from the date the Plan Administrator makes a Distribution.

149.    "**Unsecured Claims**" means, collectively, General Unsecured Claims and the Allowed Hynes Unsecured Claim.

150.    "**Unsecured Claims Recovery**" means the assets distributed from the Liquidating Debtor Net Distributable Assets to the Holders of Allowed General Unsecured Claims and the Allowed Hynes Unsecured Claim pursuant to the Distribution Calculation set forth in Section IX.F. of this Combined Joint Plan and Disclosure Statement.

151.    "**Voting Deadline**" has the meaning set forth in Section IV.A.7. of this Combined Joint Plan and Disclosure Statement.

152.    "**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et. seq.

153.    "**WARN Act Adversary Proceeding**" means that certain class-action adversary proceeding commenced by Tony Whisnant against the Debtor in the Bankruptcy Court as Case No. 18-04003.

154.    "**WARN Act Administrative Motion**" means the *Motion Seeking Allowance of and Payment for an Administrative Class Claim for WARN Act Damages* filed by the WARN Act [Docket No. 283].

155.    "**WARN Act Claim**" means the claim of the WARN Act Claimants in the WARN Act Adversary Proceeding and the WARN Act Administrative Motion.

156.    "**WARN Act Claimants**" means the plaintiffs and claimants in the WARN Act Adversary Proceeding and the WARN Act Administrative Motion.

157.    "**WARN Act Classs**" means the settlement class of WARN Act Claimants to be certified pursuant to the WARN Act Settlement Order.

158.    "**WARN Act Class Representative**" means the class representative to be appointed on behalf of the WARN Act Claimants pursuant to the WARN Act Settlement Order.

159.    "**WARN Act Class Counsel**" means the class representative to be appointed on behalf of the WARN **Act** Class pursuant to the WARN Act Settlement Order.

160.    "**WARN Act Settlement**" means the settlement of the WARN Act Adversary Proceeding and the WARN Act Administrative Motion pursuant to the terms of the WARN Act Settlement Order.

161.    "**WARN Act Settlement Motion**" means the *Joint Motion of Defendant, Proposed Class Representative and Committee, Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023 to: (i) Approve the Settlement Agreement Pursuant to Bankruptcy Rule 9019, (ii) Preliminarily Approve the Settlement Agreement Pursuant to Bankruptcy Rule 7023, (iii) Certify the Class for Settlement Purposes, Including the Appointment of Class Counsel and the Class Representative,  (iv) Approve the Form and Manner of Notice to Class Members of the Settlement, (v) Schedule a Fairness Hearing to Consider Final Approval of the Settlement Agreement, (vi) Finally Approve the Settlement Agreement Following the Fairness Hearing, and (vii) Grant Related Relief* filed by the Debtor, the WARN Act Class Representative and the Committee on September 11, 2020.

162.    "**WARN Act Settlement Order**" means the Order of the Bankruptcy Court granting the relief sought in the WARN Act Settlement Motion and approving the WARN Act Settlement.

163.    "**Wind-Down Retainer**" means the retainer paid a Plan Administrator Advisor not to exceed $30,000.00.

**B.      Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in this Combined Joint Plan and Disclosure Statement are to the respective section in, article of, Schedule to, or Exhibit to this Combined Joint Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Combined Joint Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Joint Plan and Disclosure Statement. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Joint Plan and Disclosure Statement. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in this Combined Joint Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Joint Plan and Disclosure Statement. Any reference to the "Plan Administrator" shall be deemed to include a reference to the "Liquidating Debtor" and any reference to the "Liquidating Debtor" shall be deemed to include a reference to the "Plan Administrator" unless the context otherwise requires. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Joint Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

## IV.    BACKGROUND

On the Petition Date, the Debtor Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code initiating this Chapter 11 Case. Following the Petition Date, the Debtor remained in possession of its assets and management of its businesses as a Debtor in Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**A.      Overview of the Debtor' Business**

The Debtor was an integrated supplier of solar racking systems. Racking systems consist of all the structural elements required for solar photovoltaic (PV) systems for a variety of applications. The primary market segments served are: (i) Ground mount - typically large, utility-scale power plants, (ii) Rooftop - residential and commercial systems, primarily flat roofs, and (iii) Carports - integrated shade structure and PV system for parking lots. The Debtor was headquartered in Shelby, North Carolina and is the U.S. subsidiary of Schletter, headquartered near Munich, Germany.

The Debtor worked closely with its customers to design and manufacture the racking systems for these applications. Schletter also provided geo-technical engineering and testing services, installation training, and other support services.

Schletter is the parent company of the Schletter Group, of which the Debtor is a part. The Schletter Group developed, produced, and distributed high quality, durable solar mounting systems. It had production facilities in Germany, China, and the United States. With its international sales offices, Schletter was represented on all five continents. Schletter's headquarters was located in Kirchdorf (close to Munich), Bavaria, Germany. Schletter had strong brand recognition as a producer of innovative solar mounting solutions that are highly customizable to customers and local requirements. The principal product groups were ground mounting systems for open area installations with a short installation time and long durability (more than 20 years) as well as solar mounting systems for rooftop installations on a variety of roofs. For open area projects, the main customers were project developers and investors. Rooftop systems were distributed to wholesalers, installers, and project developers.

## B.    The Debtor's Prepetition Capital and Debt Structure

1.    Equity Ownership

The Debtor's common stock is 95 percent held by Schletter Beteiligungs GmbH & Co. KG. It is noted that under German law it is usual to have shares authorized but not issued. Accordingly, the remaining 5 percent of shares are authorized but not owned by any party. Schletter owns 99.9% of Schletter Beteiligungs GmbH & Co. KG.

2.    Prepetition Indebtedness

On February 10, 2016, the Debtor entered into a Credit and Security Agreement with Midcap, as administrative agent and Lender. Midcap offered an asset based revolving loan with a commitment of $20 million. Prior to the Petition Date, Midcap had ceased advancing and was collecting all cash to pay down the loan. As of the Petition Date, the principal balance of the loan was approximately $994,000 excluding interest and fees. Midcap asserted a first priority blanket lien on all assets of the Debtor.

Prior to the Petition Date, Hynes served as a framing supplier for the Debtor for certain ongoing projects. On February 9, 2018, Hynes commenced the Hynes Litigation. The Debtor and Hynes entered into a settlement agreement on March 9, 2018. As a result, certain prepetition offsets and transfers of receivables occurred. Hynes received (i) a Subordinated Promissory Note in the amount of $2,367,000.00 and (ii) a Promissory Note in the amount of $2,000,000. Hynes asserted that these notes were secured by a second priority blanket lien pursuant to its UCC Financing statement recorded on March 29, 2018.

The Debtor was party to the CES Lease with Capital Equipment Solutions. Capital Equipment Solutions asserted a first priority lien on such specified equipment pursuant to a UCC financing statement recorded on January 22, 2016.

As of the Petition Date, the Debtor was party to the Arizona Lease and Shelby Lease and the Arizona Landlord and Shelby Landlord each held security deposits to secure obligations under the leases for the premises in Shelby, NC and Tucson, AZ.

In addition to prepetition claims of the lenders noted above, there is approximately $18 million in Claims against the Debtor from employees, trade vendors, suppliers and other vendors on an unsecured basis.

## C.     Events Precipitating the Chapter 11 Filing

1.     The German Proceeding

In 2016, the Schletter Group began a restructuring process that culminated in the filing of the German Proceeding on March 19, 2018.  In the German Proceeding, Schletter intended to sell the material assets of the Schletter Group, including the shares in the subsidiaries as well as additional operating entities currently held by Schletter Unternehmen GmbH & Co. KG, which in turn owns the majority of the Debtor, in an orderly M&A process.  It was originally contemplated that this M&A process would include the Debtor.  In order to pursue this sale option, Schletter initiated a standard auction process used in German insolvency proceedings.

The Debtor intended to use this Chapter 11 Case in connection with the German Proceeding to pursue a global sale and orderly wind-down of the Estate.

Schletter filed a petition under Chapter 15 in the United States Bankruptcy Court for the Western District of North Carolina on April 27, 2018, Case No. 18-10168, seeking recognition of the foreign proceeding and in an effort to coordinate the global proceedings.  The German Proceeding was recognized as a foreign main proceeding by order dated June 6, 2016 entered in the Chapter 15 case.

2.     Hynes Litigation

Historically, all product design and engineering was done in Germany, and the U.S. subsidiary simply manufactured and sold those products developed in Germany.  However, as markets matured, the requirements in the U.S. diverged from those in Europe.  In 2016 the Debtor's team began development of a new ground-mount system called "G-Max".  This became the first product designed and produced solely by the U.S. team.  It was innovating in its use of high-strength steel and its "hat" section, rather than the more standard "C" section for the structural elements.

Unfortunately, the U.S. team mismanaged the product introduction 2017.  It had not been piloted in a field installation, and it was not ready to be manufactured in volume.  The final engineering and testing had not been completed prior to the target production start date.  However, large contracts had been signed with major customers for approximately 600MW ($40 million) of product.  The plan was to use a subcontract manufacturer, Hynes, for approximately 30% of the production to help meet demand.

As a result of late engineering changes and production ramp-up problems, the Debtor shifted more of the production to Hynes than planned.  Ultimately the volume of production

outsourced to Hynes was almost double the planned amount.  The combination of production problems internally, the higher costs of using Hynes, and the late deliveries to customers that resulted in liquidated damages and other back charges from customers led to losses of over $10 million for the Debtor in 2017.  Liens were filed by Hynes on the projects for which Hynes supplied components, thus freezing the receivables due to Debtor, resulting in the Hynes Litigation.

On March 9, 2018, the Debtor and Hynes entered into the Hynes Settlement Agreement.  Under the Hynes Settlement Agreement, certain prepetition offsets and transfers of receivables occurred in the amount of $1,138,727.00.  Pursuant to the Hynes Settlement Agreement, the Debtor also directed certain customers to Hynes to finish projects and make direct payments totaling $1,500,000.00 to Hynes.  In connection with the Hynes Settlement Agreement, Hynes received (i) a subordinated promissory note in the amount of $2,367,000 and a promissory note in the amount of $2,000,000.  The promissory notes were to be secured by a blanket junior lien on all of the Debtor's assets.

Following the entry into the Hynes Settlement Agreement, Midcap entered into an over-advance position.  Subsequently, Midcap stopped all advances and began to collect all receivables to pay down its debt.  As a result, all cash flow ceased and Debtor was soon in arrears with its landlords, equipment lessors and its creditors.

3.     Defaults under Leases

Prior to the Petition Date, the Debtor and the Shelby Landlord entered into the Shelby Lease.  The premises subject to the Shelby Lease served as the Debtor's headquarters and production facility.  The Debtor defaulted under the Shelby Lease by failing to timely pay rent for February, March, and April 2018.  The Shelby Landlord provided Debtor notice of its defaults, but the Debtor failed to cure its defaults.  Because of the Debtor's uncured defaults, on or about April 18, 2018, the Shelby Landlord terminated the Shelby Lease.  Thereafter, the Debtor remained in possession of the premises as a holdover tenant.

Prior to the Petition Date, the Debtor and the Arizona Landlord entered into the Arizona Lease.  The premises subject to the lease served as a small office.  The Debtor defaulted under the Arizona lease by failing to timely pay rent.  On or about April 23, 2018, the Arizona Landlord locked the Debtor out of the premises.

Prior to the Petition Date, the Debtor and CES entered into the CES Lease.  The Debtor defaulted under the CES Lease on or about April 4, 2018 due to, among other defaults, its failure to make weekly rental payments.  CES threatened to exercise its remedies to repossess the equipment subject to the CES Lease unless the Debtor began making weekly rental payments.

**D.     The Chapter 11 Case**

The following is a brief description of certain material events that have occurred during this Chapter 11 Case.

1.    **First Day Orders**

Shortly after the Petition Date, the Debtor Filed a number of motions and applications (collectively, the "**First Day Motions**") seeking certain "first day" relief.  A summary of the relief sought and obtained pursuant to the First Day Motions, in part, is set forth below:

**Utilities Motion.** Following consideration of the *Debtor's Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment* [Docket No. 15], the Bankruptcy Court entered an Order [Docket No. 56] authorizing and approving the provision of adequate assurance of payment to the Debtor's utility service providers under section 366 of the Bankruptcy Code, while allowing the Debtor to avoid the threat of imminent termination of their utility services from those utility companies.

**Insurance Motion.** Following consideration of the *Motion of Debtor for Entry of an Interim and Final Order Authorizing the Debtor to Maintain Existing Insurance Policies, Pay all Policy Premiums Arising Thereunder, and Renew or Enter into New Policies* [Docket No. 17], the Bankruptcy Court entered interim and final Orders [Docket Nos. 57 and 192] authorizing the Debtor to, among other things, pay and honor certain prepetition insurance obligations, and renew, revise, extend, supplement, change, reduce or enter into additional or new insurance policies as needed in its business judgment.

**Tax Motion.** Following consideration of the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Pay Prepetition Sales, Use and Other Tax Obligations* [Docket No. 18], the Debtor withdrew the Motion at a hearing conducted on July 2, 2018.

**Employee Wages/Benefits Motion.** Following consideration of the *Motion of Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations* [Docket No. 21], the Bankruptcy Court entered interim and final Orders [Docket Nos. 53 and 192] authorizing the Debtor to, among other things, pay and honor certain prepetition employee obligations, including prepetition payroll obligations, reimbursable expenses, and benefit plan obligations.

2.    **Appointment of Creditors' Committee**

On May 10, 2018, the Bankruptcy Court appointed the Creditors' Committee consisting of the following seven (7) members: (i) Champion Tooling & Machining; (ii) Coilplus, Inc.; (iii) Crowe Logistics LLC; (iv) Joseph T. Ryerson & Son, Inc.; (v) MI Metals Inc.; (vi) PLS Logistics Services, Inc.; and (vii) Puliz Moving & Storage [Docket No. 73].  On June 5, 2018, the Bankruptcy Court entered orders authorizing the Creditors' Committee to retain JD Thompson

Law and Lowenstein Sandler LLP as counsel, effective as of May 10, 2018 [Docket Nos. 136 and 137].

3.    **Employment of Debtor's Bankruptcy Professionals**

On May 14, 2018, the Bankruptcy Court entered an order authorizing the Debtor to retain Moore & Van Allen PLLC as attorneys for the Debtor effective as of the Petition Date [Docket No. 80].

4.    **Schedules, Section 341(a) Meeting of Creditors and Proof of Claim Deadline**

On May 29, 2018, the Debtor Filed its Schedules and Statements [Docket Nos. 102 and 107].  On June 13, 2018, the Bankruptcy Administrator conducted the meeting of creditors in this Chapter 11 Case pursuant to section 341(a) of the Bankruptcy Code.  Pursuant to the *Notice of Chapter 11 Bankruptcy Case* [Docket No. 2], the proof of claim deadline was set as July 3, 2018.

5.    **Cash Collateral Orders**

On the April 27, 2018, the Debtor also Filed the *Emergency Motion of the Debtor for Authority to Use Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code* [Docket No. 19]. On May 7, 2018 the Bankruptcy Court entered the *Interim Order Authorizing Use of Cash Collateral* [Docket No. 58] which authorized the Debtor on an interim basis to use cash collateral in accordance with an agreed budget, and granted certain related relief.  The Bankruptcy Court subsequently entered the *Consent Order Authorizing Second Interim Use of Cash Collateral* [Docket No. 98]; *Consent Order Authorizing Third Interim Use of Cash Collateral* [Docket. No. 108]; *Fourth Interim Order Authorizing Use of Cash Collateral* [Docket No. 161]; and *Fifth Interim Order Authorizing Use of Cash Collateral* [Docket No. 185] (collectively, the "**Cash Collateral Orders**").

Without the use of funds provided under the Cash Collateral Orders, the Debtor would not have had sufficient available sources of working capital to, among other things, continue operating in the Chapter 11 Case and effectuate the orderly 363 Sale of its Assets.  Thus, entry of the Cash Collateral Orders were necessary to preserve, maintain, and enhance the value of the Debtor's Assets for the benefit of the Estate.

6.    **Sale of Substantially All of the Debtor's Assets**

The Debtor filed this Chapter 11 in conjunction with the German Proceeding to pursue the global sale and orderly wind-down of the Estate.

As the Chapter 11 Case progressed, certain parties in interest questioned whether there was a conflict of interest, or perhaps even a breach of fiduciary duty associated with the Debtor pursuing a sale process in connection with the German Proceeding.  Specifically, Schletter – the indirect parent of the Debtor – was soliciting bids for the sale of its assets, as well as the Debtor's assets.  The conflicting interests and obligations of each of the debtor to its respective creditors, coupled with the lack of transparency the Debtor's creditors were afforded with respect

to the sale process, the bidders and the bids, was cause for concern, particularly given the sole directors of the Debtor are the chief executive officer and financial director of Schletter.

Starting on May 31, 2018, the Debtor received various bid letters expressing interest in purchasing the Debtor's assets. As of June 4, 2018, (a) the sale process in the German Proceeding was ongoing and no purchaser(s) had been selected, (b) the Debtor did not have any authority for further use of cash collateral, and (c) the Debtor's efforts to obtain debtor-in-possession financing to fund post-petition operations had been unsuccessful. The Debtor was facing an imminent threat of having to cease operations for lack of available funding to continue operating.

In light of the foregoing the Debtor filed the 363 Sale Motion on June 6, 2018 and the Bankruptcy Court entered the Bid Procedures Order on June 11, 2018. Among other things, the Bid Procedures Order approved procedures for the marketing of the Debtor's assets, and set certain dates and deadlines, including a deadline for the Debtor to receive qualified bids, the date for an auction (if necessary) and the date for a hearing to consider the sale transaction(s) contemplated therein.

On June 12, 2018, the Debtor and the Purchaser entered into the 363 Sale Agreement.

Between the date of the Bidding Procedures Order and the deadline for submission for qualified bids (June 26, 2018), the Debtor marketed its assets for sale in consultation with the legal and financial advisors to the Creditors' Committee. During that time, the Debtor solicited bids from 47 different targets. More than 15 of those targets responded by expressing interest and requesting more information. At least 12 of the targets contacted by the Debtor executed confidentiality and non-disclosure agreements and 3 of those targets completed onsite inspections.

The Debtor did not receive any Qualified Bids (as defined in the Bidding Procedures Order) by the bid deadline. As a result, no auction was held, and the Purchaser became the successful bidder for the Acquired Assets.

On July 2, 2018, a sale hearing was held concerning the Debtor's assets. At that hearing, the Debtor and Purchaser announced agreed amendments to the 363 Sale Agreement and the Bankruptcy Court approved the sale of the Acquired Assets to the Purchaser pursuant to the 363 Sale Agreement.

After the sale hearing on July 2, 2018, the Bankruptcy Court entered the 363 Sale Order on July 3, 2018.

7.    **Key Terms of 363 Sale Agreement**

The key terms of the 363 Sale Agreement were as follows:

The Purchaser purchased the Acquired Assets for a purchase price of $2,600,000.

Midcap was given an Allowed, first-priority secured claim as of July 3, 2018 in the amount of $1,149,334 (the "**Allowed Midcap Secured Claim**"), which includes pre-petition and post-petition interest, pre-petition and post-petition attorneys' fees and expenses and a $450,000 prepayment fee (discounted to $200,000). At the closing of the 363 Sale, the Purchaser directly paid Midcap the Allowed Midcap Secured Claim, plus any additional interest, fees and costs accrued after July 3, 2018, with such payment to Midcap being in full satisfaction of all obligations of the Debtor and the Debtor's estate to Midcap.

Hynes was given an Allowed secured claim in the amount of $950,000 (the "**Allowed Hynes Secured Claim**"). At the closing of the sale, the Purchaser paid directly to Hynes a payment of $475,000 (the "**Hynes Agreed Payment**"). Hynes consented to proceeds from the Sale and otherwise payable to Hynes on account of the Allowed Hynes Secured Claim being directed to fund a $237,500 carve-out for the payment of the professional fees incurred by the Debtor and a $237,500 carve-out for the payment of the professional fees incurred by the Creditors' Committee (collectively, the "**Hynes Carve-Outs**"). The payment of the $475,000 and the funding of the Hynes Carve-Outs constituted full and complete satisfaction of all secured obligations of the Debtor and the Debtor's estate to Hynes. The Debtor also consented to Hynes being allowed a general unsecured claim in the amount of $4,000,000 (the "**Allowed Hynes Unsecured Claim**"), to be partially subordinated to all other allowed unsecured claim.

After deducting the agreed payments to Midcap and Hynes and after funding of the Hynes Carve-Outs, the amount of remaining net cash proceeds from the Sale plus the Debtor's cash-on-hand not conveyed to the Purchaser aggregated no less than $292,000.

The Debtor agreed to relinquish to the Shelby Landlord its holdover tenancy possession of the premises subject to the Shelby Lease.

8.    **Hynes Adversary Proceeding and Settlement**

On June 25, 2018, the Debtor filed the Hynes Adversary Proceeding pursuant to 11 U.S.C. §§ 502(d), 547, and 550 and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure to obtain a judgment for the avoidance and recovery of transfers made in connection with the Hynes Litigation and Hynes Settlement Agreement. The Hynes Adversary Proceeding alleges that Hynes was paid directly and indirectly no less than $1,544,097.95 on or within ninety (90) days prior to the Petition Date.

On July 20, 2018 the Debtor filed the *Motion of Schletter Inc. for Entry of an Order Allowing Claim of Hynes Industries* [Docket No. 235] and on August 10, 2018, the Bankruptcy Court entered the *Order Allowing Claim of Hynes Industries, Inc.* [Docket No. 264].

On July 20, 2018, the Debtor and Hynes filed a joint, voluntary dismissal of the Hynes Adversary Proceeding.

9.      **WARN Act Adversary Proceeding and WARN Act Administrative Motion**

On May 4, 2018, Tony Whisnant, on behalf of himself and all others similarly situated, commenced the WARN Act Adversary Proceeding seeking recovery of damages in the amount of 60 days' pay and ERISA benefits by reason of the Debtor's alleged violation of the plaintiffs' rights under the WARN Act.  On September 10, 2018, the WARN Act Claimants filed the WARN Act Administrative Motion seeking the payment of an administrative expense claim of "at least One Million Dollars ($1,000,000.00)".

The Debtor and the Creditors' Committee disputed the amount of the WARN Act Claim and raised multiple defenses thereto.  The Debtor, the Creditors' Committee and counsel for the WARN Act Class Representative on behalf of the WARN Act Claimants engaged in substantial negotiations resulting in a settlement pursuant to which the Debtor and Creditors' Committee stipulated to the allowance of the WARN Act Claim and the WARN Act Class Representative on behalf of the WARN Act Claimants stipulated to the allocation of and distribution of the Liquidating Debtor Assets pursuant to the Distribution Calculation.  Such stipulations are components of the Plan Settlement.

On September 11, 2020, the Debtor, the WARN Act Class Representative and the Committee filed the WARN Act Settlement Motion seeking, inter alia, an Order: (1)  approving the WARN Act Settlement pursuant to Bankruptcy Rule 9019; (2) preliminarily approving the WARN Act Settlement pursuant to Bankruptcy Rule 7023; (3) certifying the WARN Act Class for settlement purposes only, including the appointment of Lankenau & Miller, LLP, The Gardner Firm, P.C., as WARN Act Class Counsel and Tony Whisnant as WARN Act Class Representative; (4) approving the form and manner of notice of the WARN Act Settlement to the members of the Class; (5) scheduling a fairness hearing to consider final approval of the WARN Act Settlement (the "**Fairness Hearing**"); (6) finally approving the WARN Act Settlement Order following the Fairness Hearing; and (7) granting related relief.  The Debtor, the WARN Act Class Representative and the Committee shall seek to hold the Fairness Hearing and the Plan Confirmation Hearing contemporaneously.

10.      **Equipment Lease and Administrative Expense Claim**

The Debtor used the equipment subject to the CES Lease after the Petition Date beginning on May 22, 2018 and continuing through June 29, 2018.   As of June 29, 2018, the Debtor ceased using all equipment under the CES Lease.

On July 3, 2018, the Debtor filed a *Motion to Reject Equipment Lease and Related Agreement* [Docket No. 223], seeking to reject the CES Lease and certain related agreements, effective as of June 29, 2018.  CES's predecessor objected to the motion [Docket No. 229] arguing, *inter alia*, that the Debtor's efforts to reject the CES Lease and related agreements *nunc pro tunc* to June 29, 2018, and April 18, 2018, were inconsistent with the Bankruptcy Code and applicable law.  On July 25, 2018, the Bankruptcy Court entered the *Order on Motion to Reject Equipment Lease and Related Agreement* [Docket No. 266] rejecting CES Lease effective as of July 24, 2018.

On August 23, 2018, CES filed the *Request of Capital Equipment Solutions, LLC for Allowance of Its Administrative Expense* [Docket No. 275] in which it asserted an

administrative expense claim pursuant to sections 365(d)(5), 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code in the amount of $592,527.84.  The Debtor and the Creditors' Committee disputed CES's calculation of the amount of its Administrative Expense Claim under relevant Fourth Circuit precedent.  The Debtor, the Creditors' Committee and CES engaged in substantial negotiations resulting a settlement pursuant to which the Debtor and Creditors' Committee stipulated that the amount of CES's administrative expense claim is $155,000.00.

11.     **Scope Ruling**

Prior to the Petition Date the Debtor contested the tariffs assessed against the Debtor under the Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China.  Debtor argues that its grounding clamps are not subject to the applicable tariffs and sought relief from the Tariff Claim under the Scope Ruling Request.  On August 10, 2020, the Department of Commerce issued the Scope Ruling rejecting Debtor's position and determining that certain grounding clamps imported by Debtor were included in the scope of the antidumping duty and countervailing duty orders on aluminum extrusions.

12.     **Administrative Claims Bar Date**

On August 14, 2018, the Bankruptcy Court entered *the Order Granting the Joint Motion of the Debtor and Unsecured Creditors' Committee for an Order (I) Establishing the Deadline for Filing Administrative Claims Incurred on or before July 3, 2018, and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 266] which established September 10, 2018 as the bar date for all persons or entities (except for the professionals retained in the Chapter 11 case) asserting an Administrative Expense Claim.

13.     **Executory Contract Bar Date**

On August 10, 2018, the Bankruptcy Court entered the *Order Granting the Debtor's Omnibus Motion for the Entry of an Order Rejecting Executory Contracts and Establishing Bar Date Related Thereto* (the "**Rejection Order**") [Docket No. 263] which rejected certain executory contracts set forth on Exhibit A thereto (the "**Rejected Contracts**") effective as of July 3, 2018 and established September 10, 2018 as the deadline to assert claims arising out or relating to the rejection of the Rejected Contracts (the "**Executory Contract Bar Date**").

14.     **D&O Litigation**

Contemporaneous with or shortly after the filing of this Combined Joint Plan and Disclosure Statement, Debtor shall seek the appointment and employment of special counsel to pursue certain claims against certain former directors and officers (the "Ds&Os") and directors' and officers' insurance coverage policies (the "D&O Insurer").  The Committee and Debtor have identified a number of claims and causes of action under the policies which could produce revenue for the estate (the "D&O Litigation").  The Debtor shall retain such causes of action and pursue them for the benefit of creditors as described further herein and in the Plan Supplement.

## V.      CONFIRMATION AND VOTING

### A.      Confirmation Procedure

#### 1.      Plan Confirmation Hearing

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of this Combined Joint Plan and Disclosure Statement.  On [September 29, 2020], the Bankruptcy Court entered an order scheduling the Plan Confirmation Hearing for [November 24, 2020] at [9:30 a.m.] (ET), to consider, among other things, final approval of this Combined Joint Plan and Disclosure Statement under section 1125 of the Bankruptcy Code and confirmation of this Combined Joint Plan and Disclosure Statement under section 1129 of the Bankruptcy Code.  Notice of the Plan Confirmation Hearing will be provided to all known Creditors and other parties in interest.  The Plan Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Plan Confirmation Hearing or any subsequent adjourned Plan Confirmation Hearing.

Any objection to confirmation of this Combined Joint Plan and Disclosure Statement must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be Filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than [**November 10, 2020 at 5:00 p.m. (ET)**]: (i) counsel to the Debtor, Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, NC 28202 (Attn: Hillary Crabtree, Esq.); (ii) counsel to the Creditors' Committee, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn: Jeffrey D. Prol, Esq.);  (iii) the Office of the United Bankruptcy Administrator, 402 W. Trade St., Suite 200, Charlotte, NC 28202 (Attn: Shelley Abel, Esq.);  and (iv) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to confirmation of this Combined Joint Plan and Disclosure Statement.  **UNLESS AN OBJECTION TO CONFIRMATION OF THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT.**

#### 2.      Requirements for Confirmation

The Bankruptcy Court will confirm this Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in this Chapter 11 Case is that this Plan be (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) feasible.  The Bankruptcy Court must also find, among other things, that:

a.      this Plan has classified Claims and Interests in a permissible manner;

b.      this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

c.      this Plan has been proposed in good faith.

1.      **Best Interests of Creditors Test**

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

This Combined Joint Plan and Disclosure Statement provides for the liquidation of the Debtor under chapter 11 of the Bankruptcy Code. Although a case under chapter 7 of the Bankruptcy Code would also entail the Debtor's liquidation, the Debtor believes that its liquidation under chapter 7 would be costlier and more time-consuming than the process provided for herein and, as a result, Creditors would be disadvantaged were a chapter 7 liquidation to be pursued instead. The costs of a chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out his or her duties under the Bankruptcy Code. Other costs of liquidating the Debtor's Estate would include the expenses incurred during the bankruptcy case and allowed by the Bankruptcy Court in the chapter 7 cases. The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims. Further, any distribution to Creditors in a Chapter 7 case is likely to be delayed due to the time necessary for the Trustee and his or her advisors to get "up to speed" and the absence of certain deadlines imposed by the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims and Interests would receive less than such Holders would receive under this Combined Joint Plan and Disclosure Statement. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

2.      **Feasibility**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to this Combined Joint Plan and Disclosure Statement, the Debtor's remaining Assets are being transferred to the Liquidating Debtor to be liquidated and distributed to the Liquidating Debtor's Beneficiaries. Therefore, as this is a

liquidating Plan, the Bankruptcy Court's confirmation of this Combined Joint Plan and Disclosure Statement will not be followed by liquidation or the need for any further reorganization.

3.      **Liquidation Analysis**

In this case, the Debtor sold substantially all of its assets and paid senior secured creditors from the proceeds.  The Debtor and the Creditors' Committee reserved the Retained Causes of Action and certain other of the Debtor's assets in the sale.   Additionally sale proceeds in the amount of approximately $292,000 was preserved for the Estate.  If the Chapter 11 Cases were converted to Chapter 7 cases, the Debtor's estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtor believes that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtor. Additionally, the Debtor's estate would suffer substantial additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the estate.  The Debtor's Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Cases (such as compensation for professionals) which will constitute Allowed Claims in any Chapter 7 cases.

Based upon these reasons, the Proponents believe that creditors will receive at least as much under the Plan and likely more, than they would receive if the Chapter 11 Case was converted to a Chapter 7 case.

Attached hereto as **<u>Exhibit B</u>** is the liquidation analysis showing that the creditors will receive as much if not more in the Chapter 11 Case than it would in a Chapter 7 case.

4.      **Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires this Combined Joint Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class.  This Combined Joint Plan and Disclosure Statement creates separate Classes to treat the Administrative Expense Claims, Secured Claims, Priority Non-Tax Claims and General Unsecured Claims,  The Debtor believes that this Combined Joint Plan and Disclosure Statement's classification scheme places substantially similar Claims or Interests in the same Class and thus meets the requirements of section 1122 of the Bankruptcy Code.

5.      **Impaired Claims or Interests**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by this Combined Joint Plan and Disclosure Statement and receiving a Distribution under this Combined Joint Plan and Disclosure Statement may vote on this Combined Joint Plan and Disclosure Statement.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if this Combined Joint Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not Impaired by this Combined Joint Plan and Disclosure Statement are deemed to accept this Combined Joint Plan and Disclosure Statement and do not have the right to vote on this Combined Joint Plan and Disclosure Statement.  The Holders of Claims or Interests

in any Class that will not receive any Distribution or retain any property pursuant to this Combined Joint Plan and Disclosure Statement are deemed to reject this Combined Joint Plan and Disclosure Statement and do not have the right to vote.

6.     **Eligibility to Vote on this Combined Joint Plan and Disclosure Statement**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Class 2, 3, 4 and 5 may vote on this Combined Joint Plan and Disclosure Statement.  In order to vote on this Combined Joint Plan and Disclosure Statement, you must hold an Allowed Claim in Class 2, 3, 4 and 5 or be the Holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

All known Holders of unpaid Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims will be sent an Administrative/Priority Claim Consent Form pursuant to which the Debtor is seeking the agreement of such party to the treatment afforded to such Holder under the Plan.

7.     **Deadline for Returning Administrative Claim/Priority Claim Consent Forms**

**The Deadline for returning Administrative Claim/Priority Claim Consent Forms is [November 10, 2020 at 5:00 p.m.] (prevailing Eastern Time)**.  To be effective, all Administrative/Priority Claim Consent Forms must be properly executed, completed, and delivered as directed, so that they are actually received by the Debtor by regular mail, overnight courier or hand delivery at the following address: Moore & Van Allen PLLC, Attn: Hillary Crabtree, Esq., 100 N. Tryon St., Suite 4700, Charlotte, NC 28202, on or before [November 10, 2020 at 5:00 p.m.] (prevailing Eastern Time).

**The failure to return the Administrative/Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of an Administrative Expense Claim, Priority Tax Claim or Priority Non-Tax Claim prior to [November 10, 2020] shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash.  If an administrative or priority creditor objects to confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtor may not be able to confirm the Plan.  If the Plan cannot be confirmed for any reason, including, as a result of any such objections, the Debtor and the Creditors' Committee may seek (i) to have this Combined Joint Plan and Disclosure Statement act as a motion seeking dismissal of the Chapter 11 Case in accordance with the Bankruptcy Code or (ii) to confirm this Plan with a delayed Effective Date.  It is possible that Holders of Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims may receive a smaller distribution on account of their Claims under any alternative to the Plan.**

Holders of Claims who do not want to provide the releases to the Released Parties set forth in Section XIV. herein must affirmatively indicate so by checking the "opt out" box on their Administrative/Priority Claim Consent Form.

8.  **Procedure/Voting Deadlines**

In order for your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Debtor by regular mail, overnight courier or hand delivery to the Debtor at the following address: Moore & Van Allen PLLC, Attn: Hillary Crabtree, Esq., 100 N. Tryon St., Suite 4700, Charlotte, NC 28202

The Debtor must RECEIVE original ballots on or before [**November 10, 2020, at 5:00 p.m.**] (prevailing Eastern Time) (the "**Voting Deadline**"). Except as otherwise ordered by the Bankruptcy Court, you may not change your vote once a Ballot is submitted to the Debtor.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of this Combined Joint Plan and Disclosure Statement will be counted and cast as an acceptance or rejection, as the case may be, of this Combined Joint Plan and Disclosure Statement.

Holders of Claims who do not want to provide the releases to the Released Parties set forth in Section XIV. herein must affirmatively indicate so by checking the "opt out" box on the Ballot.

The following Ballots will not be counted or considered for any purpose in determining whether this Combined Joint Plan and Disclosure Statement has been accepted or rejected by the class in which such Holder holds a Claim or Interest:

a.  any Ballot submitted that is received after the Voting Deadline, unless the Debtor or the Court grants an extension of the Voting Deadline with respect to such Ballot;

b.  any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

c.  any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject this Combined Joint Plan and Disclosure Statement;

d.  any Ballot cast for a Claim designated or determined as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no Bankruptcy Rule 3018(a) motion has been Filed by the Bankruptcy Rule 3018(a) motion deadline;

e.  any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of this Combined Joint Plan and Disclosure Statement or that indicates both acceptance and rejection of this Combined Joint Plan and Disclosure Statement;

f.  any Ballot not bearing an original signature; or

g. any Ballot that is submitted by facsimile or other electronic communication.

9.        **Acceptance of this Combined Joint Plan and Disclosure Statement**

As a Creditor, your acceptance of this Combined Joint Plan and Disclosure Statement is important.  In order for this Combined Joint Plan and Disclosure Statement to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept this Combined Joint Plan and Disclosure Statement.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Combined Joint Plan and Disclosure Statement.  The Debtor and the Creditors' Committee urge you to vote to accept this Combined Joint Plan and Disclosure Statement.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR**.

10.        **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not contain, as of the date of commencement of the Plan Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Combined Joint Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of this Combined Joint Plan and Disclosure Statement by such Class under section 1129(a)(8) of the Bankruptcy Code.

## VI.      <u>TREATMENT OF UNCLASSIFIED CLAIMS</u>

Under Bankruptcy Code §1123(a)(1), Administrative Expense Claims, Priority Tax Claims and Statutory Fees have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article VII.

## A.      <u>Administrative Expense Claims</u>

Each Holder of an Allowed Administrative Expense Claim, except to the extent that an Administrative Expense Claim has already been satisfied during the Chapter 11 Case or a Holder of an Administrative Expense Claim and the Debtor agree to less favorable treatment, shall receive on one or more Distribution Dates, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata Share of the Administrative Expense Claims Recovery as provided under this Combined Joint Plan and Disclosure Statement and the Distribution Calculation, until all Allowed Administrative Expense Claims are paid in full or the Liquidating Debtor Net Distributable Assets are exhausted, <u>provided,</u> <u>however</u>, that all Distributions to Holders of Allowed Administrative Expense Claims shall be subject to the Plan Administrator first paying in full all Liquidating Debtor Operating Expenses and/or reserving in the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate, and first paying in full all Statutory Fees.

**The failure of a Holder of an Administrative Expense Claim to return the Administrative/Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.**

The following Administrative Expense Claims are expressly Allowed by this Combined Joint Plan and Disclosure Statement:

| Claimant | Claim Amount |
|---|---|
| WARN Act Claimants | $355,000.00 |
| CES | $155,000.00 |
| Arizona Landlord | $ 8,134.90 |

To be eligible to receive Distributions under this Combined Joint Plan and Disclosure Statement on account of an Administrative Expense Claim that is not otherwise expressly Allowed by this Combined Joint Plan and Disclosure Statement, a request for payment of an Administrative Expense Claim for Holders subject to the Administrative Bar Date Order must have been or be Filed on or before the First Administrative Expense Claim Bar Date. Any such Administrative Expense Claim that was not timely asserted by the First Administrative Expense Claim Bar Date shall be deemed disallowed under this Combined Joint Plan and Disclosure Statement and shall be forever barred against the Debtor, the Estate, the Liquidating Debtor, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

Holders of Administrative Expense Claims not subject to the Administrative Bar Date Order (including, without limitation, Professionals Fee Claims) that do not file requests or applications for payment by the Second Administrative Expense Claim Bar Date shall be prohibited and forever barred, estopped and enjoined from asserting such claims against the Debtor, the Estate, the Liquidating Debtor, or their successors or assigns, or their property and such claims shall be deemed discharged as of the Effective Date. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

The Debtor shall serve a notice, within five days after the Effective Date, of the Second Administrative Expense Claim Bar Date on all applicable Holders of Administrative Claims. Notwithstanding the foregoing, all fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date, and the U.S. Bankruptcy Administrator shall not be required to file a request for payment of such fees.

**B.      Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Professional Fees Bar Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. Professional Fee

Claims that are Allowed by entry of an order of the Bankruptcy Court shall be treated as Allowed Administrative Claims pursuant to this Combined Joint Plan and Disclosure Statement and the Plan Administrator shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals pursuant to the Distribution Calculation set forth herein.

### C.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, except to the extent that a Priority Tax Claim has already been satisfied during the Chapter 11 Case or a Holder of an Priority Tax Claim and the Debtor agree to less favorable treatment, shall receive on one or more Distribution Dates, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata Share of the Priority Claims Recovery as provided under this Combined Joint Plan and Disclosure Statement and the Distribution Calculation, until all Allowed Priority Tax Claims are paid in full or the Liquidating Debtor Net Distributable Assets are exhausted; provided, however, that all Distributions to Holders of Allowed Priority Tax Claims shall be subject to the Plan Administrator first paying in full all Liquidating Debtor Operating Expenses and/or reserving in the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate, and first paying in full all Statutory Fees.

On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.

**The failure of a Holder of a Priority Tax Claim to return the Administrative/Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.**

### D.    Statutory Fees

The Debtor shall pay all Statutory Fees due and owing on the Effective Date based on administration of the Estate and the Initial Distribution.  Upon any Final Distribution, the Statutory Fees shall be paid calculated against Recovery pursuant to section 1930 of title 28 of the United States Code.

## VII.    CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

Claims—other than Statutory Fees, Administrative Expenses Claims, Priority Tax Claims and Statutory Fees — are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Combined Joint Plan and Disclosure Statement, as follows:

| Class | Type | Status Under Plan | Voting Status |
|-------|------|-------------------|---------------|
| 1 | Priority Non-Tax Claims | Impaired | Deemed to Accept Pursuant to Consent |

| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Allowed Hynes Unsecured Claim | Impaired | Entitled to Vote |
| 5 | Equity Interests | Impaired | Deemed to Reject |

## VIII.   TREATMENT OF CLAIMS AND INTERESTS

### A.   Treatment of Claims

1.   Priority Non-Tax Claims

Class 1 consists of all Priority Non-Tax Claims.  All known Holders of Priority Non-Tax Claims have been sent an Administrative/ Priority Claim Consent Form pursuant to which the Debtor is seeking the affirmative agreement of such party to the treatment afforded to such Holder under the Plan.  The treatment afforded to Holders of Priority Non-Tax Claims under the Plan is only available if each such Holder agrees to such treatment.

**The failure of a Holder of a Priority Non-Tax Claim to return the Administrative/Priority Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.**

a.   Impairment and Voting

Class 1 is Impaired under the Plan.  Holders of Allowed Priority Non-Tax Claims are unlikely to receive payment in full in Cash on account of such Allowed Claims under the Plan and, therefore, are being asked to agree to different treatment under the Plan.  As such, Holders of such Claims will receive an Administrative/ Priority Claim Consent Form which sets forth the process for providing such agreement.  Such Holders are not entitled to vote to accept or reject the Plan.

b.   Treatment

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment with the Debtor, Liquidating Debtor or Plan Administrator, each Holder, if any, of an Allowed Priority Non-Tax Claim whose Claim has not been otherwise satisfied prior to the Effective Date shall receive, on one or more Distribution Dates, its Pro Rata Share of the Priority Claims Recovery as provided under this Combined Joint Plan and Disclosure Statement and the Distribution Calculation, until all Allowed Priority Non-Tax Claim are paid in full or the Liquidating Debtor Net Distributable Assets are exhausted, provided, however, that all Distributions to Holders of Allowed Priority Non-Tax Claims shall be subject to the Plan Administrator first paying in full all Liquidating Debtor Operating Expenses and/or reserving in the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate, and first paying in full all Statutory Fees.  To be eligible to receive

Distributions under this Combined Joint Plan and Disclosure Statement on account of an Priority Non-Tax Claim that is not otherwise expressly Allowed by this Combined Joint Plan and Disclosure Statement, a request for payment of an Priority Non-Tax Claim must have been or be Filed on or before the General Bar Date or scheduled as undisputed, liquidated and noncontingent on the Debtor's Schedules.  Any Priority Non-Tax Claim that is not timely asserted by the General Bar Date or Scheduled in accordance herewith shall be deemed disallowed under this Combined Joint Plan and Disclosure Statement and shall be forever barred against the Debtor, the Estate, the Liquidating Debtor, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

2.    **Class 2 – Secured Claims**

a.    <u>Classification</u>

Class 2 consists of all Secured Claims, if any.

b.    <u>Impairment and Voting</u>

Class 2 is Unimpaired.  Holders of Allowed Class 2 Secured Claims are deemed to have accepted this Combined Joint Plan and Disclosure Statement and, thus, are not entitled to vote to accept or reject this Combined Joint Plan and Disclosure Statement.

c.    <u>Treatment</u>

Except to the extent that a Holder of an Allowed Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practical after, the Effective Date or the date such Claim becomes an Allowed Secured Claim, each Holder of such Allowed Secured Claim shall receive, as the Plan Administrator, determines, (i) the Collateral securing such Allowed Secured Claim or (ii) such other treatment as renders such Holder's Allowed Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that any deficiency Claims of Holders of Class 2 Secured Claims shall not constitute Class 2 Secured Claims and shall be treated as Class 3 General Unsecured Claims.  For the avoidance of doubt, the Allowed Midcap Secured Claim and the Allowed Hynes Secured Claim were paid in full and satisfied by the sale proceeds pursuant to the 363 Sale Order.

3.    **Class 3 – General Unsecured Claims**

a.    <u>Classification</u>

Class 3 consists of all General Unsecured Claims.

b.    <u>Impairment and Voting</u>

Class 3 is Impaired, and Holders of Allowed General Unsecured Claims in Class 3 are entitled to vote to accept or reject this Combined Joint Plan and Disclosure Statement.

c.      Treatment

Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, on one or more Distribution Dates, its Pro Rata Share of the Unsecured Claims Recovery as provided under this Combined Joint Plan and Disclosure Statement and the Distribution Calculation, until all Allowed General Unsecured Claims in Class 3 are paid in full or the Liquidating Debtor Net Distributable Assets are exhausted; provided, however, that all Distributions to Holders of Allowed General Unsecured Claims shall be subject to the Plan Administrator first paying in full all Liquidating Debtor Operating Expenses and/or reserving in the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate, and first paying all Allowed Priority Tax Claims and Statutory Fees upon the terms set forth in this Combined Joint Plan and Disclosure Statement.  To be eligible to receive Distributions under this Combined Joint Plan and Disclosure Statement on account of a General Unsecured Claim that is not otherwise expressly Allowed by this Combined Joint Plan and Disclosure Statement, a request for payment of an General Unsecured Claim must have been or be Filed on or before the General Bar Date or scheduled as undisputed, liquidated and noncontingent on the Debtor's Schedules. Any General Unsecured Claim that is not timely asserted by the General Bar Date or Scheduled in accordance herewith shall be deemed disallowed under this Combined Joint Plan and Disclosure Statement and shall be forever barred against the Debtor, the Estate, the Liquidating Debtor, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

4.      Class 4 – Allowed Hynes Unsecured Claim

a.      Classification

Class 4 consists of the Allowed Hynes Unsecured Claim.

b.      Impairment and Voting

Class 4 is Impaired because the Holder of the Allowed Hynes Unsecured Claim in Class 4 will receive no Distribution under this Combined Joint Plan and Disclosure Statement unless and until the payments to all other unsecured creditors has reached the level of 20% of the Allowed amounts of their claims as discussed further in the section 5(c).  The Holder of Class 4 Allowed Hynes Unsecured Claim is entitled to vote to accept or reject this Combined Joint Plan and Disclosure Statement.

c.      Treatment

The Allowed Hynes Unsecured Claim is partially subordinated to all other Class 3 Allowed General Unsecured Claims.  The Holder of the Allowed Hynes Unsecured Claim shall not receive any distribution on account of its Allowed Hynes Unsecured Claim unless and until the payments to the Holders all other General Unsecured Claims have reached the level of 20% of the Allowed amounts of the General Unsecured Claims and an appropriate reserve has been established in an amount that is no less than 20% of the aggregate stated value of all disputed

General Unsecured Claims, after which point the Holder of the Allowed Hynes Unsecured Claim will share Pro-Rata in any further distributions from the Unsecured Claims Recovery. All Distributions to the Holder of the Allowed Hynes Unsecured Claim shall be further subject to the Plan Administrator first paying in full all Liquidating Debtor Operating Expenses and/or reserving in the Liquidating Debtor Operating Reserve for such Liquidating Debtor Operating Expenses as reasonable and appropriate, and first paying all Allowed Priority Tax Claims and Statutory Fees upon the terms set forth in this Combined Joint Plan and Disclosure Statement.

> 5. **Class 5 – Equity Interests**
>
>> a. <u>Classification</u>
>
> Class 5 consists of all equity interests in the Debtor.
>
>> b. <u>Impairment and Voting</u>
>
> Class 5 is Impaired. Because Holders of Equity Interests will receive no Distribution under this Combined Joint Plan and Disclosure Statement, Class 5 shall be deemed to have voted to reject this Combined Joint Plan and Disclosure Statement.
>
>> c. <u>Treatment</u>
>
> On the Effective Date, all Equity Interests (including any and all options or rights to exercise warrants or options or to otherwise acquire any Equity Interests) shall be cancelled, deemed terminated, and of no further force and effect, and the Holders of Equity Interests shall not receive or retain any Distribution or property on account of such Equity Interests.

**B.    <u>Modification of Treatment of Claims and Interests</u>**

The Debtor, in consultation with the Creditors' Committee, reserves the right to modify the treatment of any Allowed Claim or Interest in any manner adverse only to the Holder of such Claim or Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Interest whose Allowed Claim or Interest, as the case be, is being adversely affected.

**C.    <u>Cramdown and No Unfair Discrimination</u>**

In the event that any impaired Class of Claims or Interests rejects this Plan or is deemed to have rejected this Plan, the Debtor hereby requests, without any delay in the occurrence of the Plan Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case this Combined Joint Plan and Disclosure Statement shall constitute a motion for such relief.

## IX.    MEANS OF IMPLEMENTATION OF THE PLAN

### A.    Post-Effective Date Governance and Dissolution of Debtor.

Immediately following the occurrence of the Effective Date, (a) the board of directors of the Debtor shall be terminated and the members of the board of directors of the Debtor shall be deemed to have resigned, (b) the Plan Administrator shall be appointed as the sole director and/or manager of the Liquidating Debtor; and (c) the Debtor shall continue to exist as the Liquidating Debtor after the Effective Date in accordance with the laws of the state of incorporation of the Debtor and pursuant to its certificate of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except if and to the extent such organizational documents are amended under the Plan, including for the limited purposes of liquidating all of the assets of the Estate, making distributions in accordance with the Plan, reducing the size of board of directors or the number of managers, and performing such obligations as are required to be performed, until such time as the Plan Administrator reasonably concludes (upon consultation with the Oversight Committee to created pursuant to Section X.I. of this Combined Joint Plan and Disclosure Statement) such performance is complete or no longer required, and such other activities as are ancillary, necessary or convenient to the foregoing and the implementation of this Plan.

On the Effective Date, and without further order of the Bankruptcy Court, the Debtor or the Plan Administrator, on behalf of the Liquidating Debtor, may execute and file documents and take all other actions as they deem appropriate relating to the foregoing corporate actions under applicable state laws and, in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect any necessary corporate changes of the Debtor as provided herein, without the payment of any fee, tax or charge and without the need for the filing of reports or certificates.

On and after the Effective Date, the Debtor (i) shall be deemed to have withdrawn its business operations from any state in which it was previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, and (ii) shall not be liable in any manner to any taxing or other authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

As soon as practicable after the conclusion of all litigation relating to the Debtor and distribution of all Liquidating Debtor Assets, the Plan Administrator shall, at the expense of the Debtor's Estate, (i) provide for the retention and storage, destruction or abandonment of the books, records and files that shall have been held or maintained by the Debtor or Liquidating Debtor, subject to Section IX.N.; (ii) file a certificate stating that the Liquidating Debtor Assets have been exhausted and final distributions of Cash have been made under the Plan; (iii) file the necessary paperwork in the relevant state of incorporation of the Liquidating Debtor to effectuate the dissolution of the Liquidating Debtor in accordance with the laws of such jurisdiction; and (iv) upon completion of all duties pursuant to the Plan, resign as the sole officer and manager, as applicable, of the Liquidating Debtor.  Upon the filing of certificate(s) described in clause (ii) of the preceding sentence, the Debtor and/or Liquidating Debtor shall be deemed dissolved for all

purposes without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtor or payments to be made in connection therewith.

## B.    Causes of Action.

On the Effective Date, all Retained Causes of Action, including but not limited to the D&O Litigation, belonging to the Debtor shall be vested in the Liquidating Debtor. The Plan Administrator shall have the authority to determine, for each pending action on behalf of the Debtor, whether to dismiss such action or to be deemed the plaintiff in such matter with respect to the pending action on behalf of the Debtor. All recoveries from Retained Causes of Action shall become Liquidating Debtor Assets and shall be distributed pursuant to the Joint Plan and Disclosure Statement and the Distribution Calculation. Notwithstanding anything to the contrary herein, the Plan Administrator shall control the Retained Causes of Action, including the investigation, prosecution and disposition of same, in accordance with the terms of the this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, and the Plan Administrator Agreement.

## C.    Plan Settlement and General Settlement of Claims and Interests.

This Combined Joint Plan and Disclosure Statement incorporates the compromise and settlement (the "**Plan Settlement**") of numerous debtor-creditor issues designed to achieve an economic resolution of Claims against the Debtor and an efficient resolution of this Chapter 11 Case, including, among other things, the settlement of a number of potential issues such as allocation of Assets and expenses among the Estate as set forth in the Distribution Calculation, the funding of the Liquidating Debtor Operating Reserve, the Liquidating Debtor Operating Budget, and the Stipulated Administrative Expense Settlement Claims. The Plan Confirmation Order will serve to, among other things, approve the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and will contain findings that the compromises and settlements under the Plan Settlement are in the best interests of the Debtor, its Estate, its creditors, and other parties-in-interest, and are fair, equitable, and well within the range of reasonableness and otherwise satisfy the requirements of Bankruptcy Rule 9019. Each provision of the Plan Settlement shall be deemed non-severable from each other and from the remaining terms of this Combined Joint Plan and Disclosure Statement. Commencing on the Effective Date, the Plan Administrator shall implement the allocation of the Debtor's Assets to the Debtor's Estate in accordance with the Distribution Calculation.

The Plan Settlement includes the following compromises:

**WARN Act Settlement**. As detailed in Section IV.D.9. herein, the WARN Act Class Representative on behalf of the WARN Act Claimants, the Debtor and the Creditors' Committee engaged in substantial negotiations during this Chapter 11 Case resulting in a settlement pursuant to which the Debtor and Creditors' Committee stipulated to the allowance of the WARN Act Claim as an Administrative Expense Claim in the amount of $355,000.00 and the WARN Act Class Representative on behalf of the WARN Act Claimants stipulated to the allocation of and distribution of the Liquidating Debtor Assets pursuant to the Distribution Calculation. Such settlement resolved the WARN Act Adversary Proceeding and the WARN Act Administrative Motion, including substantial disputes relating to the amount of the WARN Act

Claimants' Claim and the multiple defenses thereto raised by the Debtor and the Creditors' Committee. The settlement provided a substantial reduction from the claim of "at least One Million Dollars ($1,000,000.00)" initially sought by the WARN Act Claimants in the WARN Act Administrative Motion.

The WARN act settlement resolves all priority claims of employees other than paid time off claims. Such claims remain priority claims subject to the Omnibus Objection to Claims to be filed no later than October 14, 2020 by the Debtor.

**CES Settlement**. As detailed in Section IV.D.10. herein, CES, the Debtor and the Creditors' Committee engaged in substantial negotiations during this Chapter 11 Case resulting in a settlement pursuant to which the Debtor and Creditors' Committee stipulated to the allowance of CES's Administrative Expense Claim in the amount of $155,000.00. Such settlement resolved the disputes at issue in the *Request of Capital Equipment Solutions, LLC for Allowance of Its Administrative Expense* [Docket No. 275], including disputes relating to the CES's calculation of the amount of its Administrative Expense Claim under relevant Fourth Circuit precedent and provided a substantial reduction from the $592,527.84 sought by CES in its initial claim.

**Arizona Landlord Settlement**. As detailed in Section IV.C.3. herein, the Arizona Landlord and the Debtor engaged in substantial negotiations during this Chapter 11 Case resulting in a settlement pursuant to which the Debtor stipulated to the allowance of Arizona Landlord's Administrative Expense Claim in the amount of $8,134.90 and the Arizona Landlord stipulated to the allocation and distribution of the Liquidating Debtor Assets pursuant to the Distribution Calculation.

**Professional Fee Claims**. The Debtor Professionals and the Committee Professionals engaged in substantial negotiations with the other Administrative Claimants during this Chapter 11 Case regarding the allocation and distribution of the Liquidating Debtor Assets pursuant to which the Debtor stipulated to the allowance of Professional Fee Claims of the Debtor Professionals and the Committee Professionals in the amounts detailed in Section VIII.A.1. herein, subject to the approval of final fee applications, and the Debtor Professionals and the Committee Professionals stipulated to the allocation and distribution of the Liquidating Debtor Assets pursuant to the Distribution Calculation.

Accordingly, on the Effective Date, and in consideration for the classification, distributions, releases, and other benefits provided under this Combined Joint Plan and Disclosure Statement and the Plan Settlement, the provisions of this Combined Joint Plan and Disclosure Statement shall constitute a good-faith compromise and settlement of all Claims, Interests or Causes of Action that (a) are subject to compromise and settlement pursuant to the terms of this Combined Joint Plan and Disclosure Statement; (b) have been released pursuant to Section XIV. of this Combined Joint Plan and Disclosure Statement; (c) are subject to the exculpation pursuant to Section XIV. of this Combined Joint Plan and Disclosure Statement; or (d) are otherwise stayed or terminated pursuant to the terms of this Combined Joint Plan and Disclosure Statement.

**D.      Plan Funding.**

Distributions under this Plan and the Plan Administrator's post-Effective Date expenses will be funded from the Liquidating Debtor Assets, proceeds of Other Recoveries and net proceeds of Retained Causes of Action.

**E.      Vesting of Assets**

Except as expressly provided elsewhere in this Plan (including pursuant to the Distribution Calculation), on the Effective Date, the property of the Debtor's Estate shall vest in the Liquidating Debtor and be distributed according to this Plan; provided, however, that the Plan Administrator may abandon or otherwise not accept any Liquidating Debtor Assets that the Plan Administrator believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Debtor.  Any Liquidating Debtor Assets that the Plan Administrator so abandons or otherwise does not accept shall not be property of the Liquidating Debtor.  As of the Effective Date, all Liquidating Debtor Assets vest in the Liquidating Debtor and all Assets dealt with in this Combined Joint Plan and Disclosure Statement shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Combined Joint Plan and Disclosure Statement or in the Plan Confirmation Order.

**F.      Distribution Calculation.**

1.      Initial Distributions

On the Effective Date, the Plan Administrator shall create and fund the Liquidating Debtor Operating Reserve in Cash from the Liquidating Debtor Funding Amount in the amount set forth in the Liquidating Debtor Operating Budget.  All remaining Cash from the Liquidating Debtor Funding Amount shall be deemed to be Liquidating Debtor Net Distributable Assets and shall be distributed to the Holders of Allowed Administrative Expense Claims on a Pro Rata basis for the applicable Claims (the "**Initial Distribution**") as soon as reasonably practicable after the Effective Date (the "**Initial Distribution Date**"); provided, however, that the Plan Administrator shall fund the Disputed Claims Reserve in an amount equal to such amounts that would be distributed on such date on account of Disputed Claims in accordance with the terms of this Combined Joint Plan and Disclosure Statement.

2.      Interim Distributions

After the receipt of any Recoveries (and after the payment of any contingency fees), the Plan Administrator shall make interim distributions of Liquidating Debtor Net Distributable Assets (each, an "**Interim Distribution**") at such time as the Plan Administrator shall determine, in its sole discretion, to be reasonably practicable, economically prudent and efficient to make such a Distribution (each such time, an "**Interim Distribution Date**").  Such Distributions shall be in accordance with this Combined Joint Plan and Disclosure Statement; provided, however, that the Liquidating Debtor Net Distributable Assets shall be reduced by any additional amounts used to fund the Liquidating Debtor Operating Reserve and the Plan Administrator shall fund the Disputed Claims Reserve in an amount equal to such amounts that would be distributed on such date on account of Disputed Claims in accordance with the terms of this Combined Joint Plan and Disclosure Statement.

Such Liquidating Debtor Net Distributable Assets shall be distributed as follows:

• The first $500,000 of Liquidating Debtor Net Distributable Assets attributable to such Recoveries shall be distributed to the Holders of Allowed Administrative Expense Claims on a Pro Rata basis for the applicable Claims.

• The second $500,000 000 of Liquidating Debtor Net Distributable Assets attributable to such Recoveries shall be distributed as follows:

- 65% to the Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims to be distributed on a Pro Rata basis for the applicable Class of Claims as follows: 80% of such amount to the Holders of Allowed Administrative Expense Claims and 20% of such amount to Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims; and

- 35% to Holders of Allowed General Unsecured Claims in Class 3 and the Holder of Allowed Hynes Unsecured Claim in Class 4; provided, however, that any distribution to the Holder of the Allowed Hynes Unsecured Claim shall be subject to the partial subordination to all other Class 3 Allowed General Unsecured Claims set forth in Section VIII.A.5. of this Combined Joint Plan and Disclosure Statement.

• The balance of Liquidating Debtor Net Distributable Assets attributable to such Recoveries shall be distributed as follows until the Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims are paid in full:

- 50% to the Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims to be distributed on a Pro Rata basis for the applicable Class of Claims as follows: 80% of such amount to the Holders of Allowed Administrative Expense Claims and 20% of such amount to Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims; and

- 50% to Holders of Allowed General Unsecured Claims in Class 3 and the Holder of Allowed Hynes Unsecured Claim in Class 4 on a Pro Rata basis for the applicable Claims; provided, however, that any distribution to the Holder of the Allowed Hynes Unsecured Claim shall be subject to the partial subordinated to all other Class 3 Allowed General Unsecured Claims set forth in Section VIII.A.5. of this Combined Joint Plan and Disclosure Statement.

• Upon the payment of the Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in full, the balance of the Liquidating Debtor Net Distributable Assets attributable to such Recoveries shall be distributed to Holders of Allowed General Unsecured Claims in Class 3 and the Holder of Allowed Hynes Unsecured Claim

in Class 4 on a Pro Rata basis for the applicable Claims; provided, however, that any distribution to the Holder of the Allowed Hynes Unsecured Claim shall be subject to the partial subordination to all other Class 3 Allowed General Unsecured Claims set forth in Section VIII.A.5. of this Combined Joint Plan and Disclosure Statement.

      3.      Final Distributions

The Liquidating Debtor shall be dissolved and its affairs wound up and the Plan Administrator shall make the final distributions (the "**Final Distribution**") on the date when, in the reasonable judgment of the Plan Administrator (and, if still in existence, in consultation with the Oversight Committee), substantially all of the assets of the Liquidating Debtor have been liquidated and there are no substantial potential Recoveries for distribution and all pending Claims and/or governmental investigations are resolved and concluded (the "**Final Distribution Date**"). The date on which the Plan Administrator determines (in consultation with the Oversight Committee if still in existence) that all obligations under the Plan and the Plan Administrator Agreement have been satisfied is referred to as the "**Plan Termination Date**". On the Plan Termination Date, the Plan Administrator shall, to the extent not already done, request that the Bankruptcy Court enter an order closing the Chapter 11 Case.

**G.**      **Accounts and Reserves.**

      1.      Liquidating Debtor Operating Reserve

On or before the Effective Date, the Plan Administrator shall create and fund the Liquidating Debtor Operating Reserve in Cash in the amount set forth in the Liquidating Debtor Operating Budget and approved in the Plan Confirmation Order. Subject to Sections IX.F. and IX.G.2., no payments to the Plan Administrator and Plan Administrator Professionals shall be made from any source other than the Liquidating Debtor Operating Reserve. Notwithstanding the above, the actual and reasonable costs of mailing the Final Distribution and winding down the Liquidating Debtor pursuant to state statutory requirements shall be paid from the Recoveries. The Plan Administrator shall segregate and shall not commingle the Cash held in the Liquidating Debtor Operating Reserve. Upon the dissolution of the Liquidating Debtor and the conclusion of all wind-down activities of the Plan Administrator, any remaining Cash in the Liquidating Debtor Operating Reserve shall be distributed in accordance with the Distribution Calculation set forth in Section IX.F. of this Combined Joint Plan and Disclosure Statement as Liquidating Debtor Net Distributable Assets. The Liquidating Debtor Operating Budget and Liquidating Debtor Operating Reserve may be modified by the Plan Administrator and increased from Liquidating Debtor Net Distributable Assets upon either further order of the Bankruptcy Court or the reasonable consent of the Oversight Committee (not to be unreasonably withheld).

      2.      Other Reserves and Modification to Reserves

Subject to and in accordance with the provisions of the Plan Administrator Agreement and the Liquidating Debtor Operating Budget, the Plan Administrator may establish and administer any other necessary reserves that may be required under the Plan or the Plan Administrator Agreement, including the Wind Down Reserve from any Recovery.

Additionally, and notwithstanding anything to the contrary contained in the Plan, the Plan Administrator may make transfers between the reserves established under the Plan to satisfy Claims and other obligations in accordance with the Plan, and may increase any reserve including from the Liquidating Debtor Net Distributable Assets.

For the further avoidance of doubt, and notwithstanding anything herein to the contrary, to the extent that the Liquidating Debtor Operating Reserve and Liquidating Debtor Operating Budget is insufficient to satisfy all wind-down costs and expenses of the Liquidating Debtor, no distributions shall be made unless and until the Liquidating Debtor Operating Reserve is increased by the Plan Administrator (upon further order of the Bankruptcy Court or the prior reasonable consent of the Oversight Committee, which consent shall not be unreasonably withheld) with available funds from the Liquidating Debtor Net Distributable Assets in an amount sufficient to satisfy all wind-down costs and expenses of the Liquidating Debtor.

**H.    Cancellation of Certain Instruments and Agreements.**

Except as otherwise provided in this Combined Joint Plan and Disclosure Statement, on and after the Effective Date, all notes, instruments, debentures, certificates, agreements, options, warrants, rights, and other instruments evidencing an ownership interest in the Debtor, contractual, legal, equitable, or otherwise, to acquire any of the foregoing, indentures, mortgages, security documents, and other documents evidencing Claims or Interests shall be automatically extinguished, cancelled, surrendered rejected, terminated and of no further effect with the Debtor having no continuing obligations thereunder without any need for further action, notice, deed or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtor or the Liquidating Debtor, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full; provided that notwithstanding Confirmation or consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; provided, further, that except as provided herein, the preceding proviso shall not affect the settlement and release of Claims or Interests pursuant to the Bankruptcy Code, the Plan Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtor or the Liquidating Debtor, as applicable.

Additionally, as of the Effective Date, the Debtor's securities registered under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, shall be automatically deregistered and all related reporting obligations with the Securities and Exchange Commission shall be automatically terminated.

**I.    Compliance with the Asset Purchase Agreements.**

Notwithstanding anything in the Plan to the contrary, nothing herein shall modify any obligations of the Debtor or the Purchaser under the 363 Sale Documents.

**J.    Exemption from Certain Taxes and Fees.**

Pursuant to section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer from the Debtor to the Liquidating Debtor, or to any other Person pursuant to this Combined Joint Plan and Disclosure Statement, shall not be subject to any document

recording tax, mortgage tax, mortgage recording tax, stamp tax, real estate tax, transfer tax, conveyance fee, intangibles or other similar tax or governmental assessment, and the Plan Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the forgoing instruments or other documents without the payment of any such tax or governmental assessment.

## K.    Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtor and its Estate shall retain all of the Retained Causes of Action (including those Causes of Action to be identified in the Plan Supplement) other than any Causes of Action expressly released pursuant to the terms of this Plan or an order of the Bankruptcy Court, and such Retained Causes of Action of the Debtor shall remain vested in the Liquidating Debtor on the Effective Date.  From and after the Effective Date, prosecution and settlement of all Retained Causes of Action shall be the sole responsibility of the Liquidating Debtor pursuant to this Combined Joint Plan and Disclosure Statement and the Plan Confirmation Order.  The Plan Administrator may enforce all rights to commence and pursue any and all Retained Causes of Action, whether arising before or after the Petition Date, including, without limitation, any actions or categories of actions specifically enumerated in a list of the Retained Causes of Action contained in the Plan Supplement, and such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtor.  The Plan Administrator, subject to Section X.I. but otherwise in its sole discretion, shall determine whether to bring, settle, release, compromise, abandon or enforce such Retained Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Plan Administrator may pursue Retained Causes of Action in accordance with the best interests of the beneficiaries of the Debtor's Estate.  **No Entity may rely on the absence of a specific reference in this Plan or the Plan Supplement to any Retained Cause of Action against it as any indication that the Plan Administrator will pursue or not pursue any and all available Retained Causes of Action.  The Plan Administrator and Liquidating Debtor expressly reserve all rights to prosecute any and all Retained Causes of Action of the Debtor against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.**  Unless any Retained Causes of Action of the Debtor against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves all of the Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of Confirmation or consummation of this Combined Joint Plan and Disclosure Statement.

## L.    Insured Claims.

Notwithstanding anything to the contrary contained herein, to the extent any Insurance Contract(s) provides coverage with respect to any Claim, the Holder of such Claim shall, without duplication, (a) be paid only to the extent of any available coverage under any applicable Insurance Contract(s), and (b) if such Claim is entitled to receive the treatment provided for in this

Plan for Allowed Claims, be paid only to the extent the applicable Insurance Contract(s) does not provide coverage with respect to any portion of the Claim. If the Holder of any such Claim has received payment under this Plan and under any Insurance Contract that results in a double recovery, then (i) the Holder shall be required to return the amount received under the Plan, to the extent of such double recovery, to the Plan Administrator (for the benefit of the Liquidating Debtor, and (ii) the Plan Administrator and Liquidating Debtor shall be entitled to commence legal action against such Holder, if necessary, to recover such double recovery in accordance with this Plan.

## M.    **Preservation of Privilege and Defenses.**

The Plan Confirmation Order shall provide that, on the Effective Date, all of the Debtor's privileges and work product, including but not limited to any attorney-client privilege or work- product privilege attaching to any documents or communications (whether written or oral), related to the Retained Causes of Action, shall be maintained by the Plan Administrator, which will have exclusive authority to waive or not waive the Debtor' privileges in its sole discretion. The Plan Confirmation Order shall further provide that nothing in the Plan (including this Section IX.M.) or the Plan Confirmation Order is intended to, does, or may be construed to expand the privileges or other protections against disclosure, if any, belonging to the Debtor as of the Effective Date, it being understood that the purpose of this Section IX.M. and any corresponding provisions in the Plan Confirmation Order is to ensure that any privileges and other protections against disclosure existing as of the Effective Date are preserved and are not waived.

The Plan Administrator will seek to preserve and protect all applicable privileges and work product vested in the Liquidating Debtor. The Plan Administrator's receipt of such information shall not waive any privileges and such privileges are preserved. The Liquidating Debtor and the individual directors, officers or members/managers of the Debtor shall remain in control of all of their respective privileges (subject to the provisions of the foregoing paragraphs), and the Liquidating Debtor, and the individual directors, officers or members/ managers of the Debtor, each as applicable, retain the right to waive their own privileges prospectively.

## N.    **Books and Records.**

On the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtor, shall: (a) take possession of all books, records, and files of the Debtor and the Estate that were not sold and transferred in connection with the 363 Sale and are necessary for the administration of the Liquidating Debtor; and (b) provide for the retention and storage of such books, records, and files until such time as the Plan Administrator determines, in accordance with the Plan Administrator Agreement, that retention of same is no longer necessary or beneficial.

The Plan Administrator shall be free, in its discretion (subject to consultation with the Oversight Committee) to abandon, destroy or otherwise dispose of any books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, upon reasonable notice to parties in interest, including relevant governmental entities. With respect to any books and records that are not, in the view of the Plan Administrator, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtor or Liquidating Debtor, any Causes of Action, or the wind-down of the Debtor's

Estate, the Plan Administrator shall be free, in its discretion (subject to consultation with the Oversight Committee) to abandon, destroy or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other Order of the Bankruptcy Court and shall have no liability for same.

To the extent any of the books, records, and files of the Debtor have been transferred in connection with the 363 Sale, the Plan Administrator shall have access to such books, records and files at no material cost to the Liquidating Debtor.

.

## X.    THE PLAN ADMINISTRATOR.

### A.    Appointment of the Plan Administrator

The Plan Administrator shall be selected by the Creditors' Committee, in consultation with the Debtor, and shall be identified prior to the Plan Confirmation Hearing in the Plan Supplement.  The Debtor shall include the information set forth in sections 1129(a)(4) and (5) of the Bankruptcy Code in the Plan Supplement designating the individual selected as Plan Administrator.  At the Plan Confirmation Hearing, the Bankruptcy Court shall consider and, if appropriate, ratify the selection of the Plan Administrator.  The approved Person shall serve as the Plan Administrator upon execution of the Plan Administrator Agreement on the Effective Date. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  On the Effective Date, all Beneficiaries of the Liquidating Debtor shall be deemed to have ratified and become bound by the terms and conditions of the Plan Administrator Agreement.  In the event that the Plan Administrator resigns or is removed, terminated, or otherwise unable to serve as the Plan Administrator, then a successor shall be appointed as set forth in the Plan Administrator Agreement.  Any successor Plan Administrator appointed shall be bound by and comply with the terms of this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, and the Plan Administrator Agreement.

### B.    The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtor shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement.  Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtor prior to the Effective Date are hereby ratified.  The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of this Combined Joint Plan and Disclosure Statement and to facilitate the orderly and effective liquidation of the Debtor's (or Liquidating Debtor's) remaining assets and to maximize the recovery thereof; provided that any such modifications shall not impair the rights of (i) the Oversight Committee, or (ii) any Holder of Allowed General Unsecured Claims, in each case without the reasonable consent of the Creditors' Committee or Oversight Committee, as applicable, which consent shall not be unreasonably withheld.

C.      **Beneficiaries of Liquidating Debtor**

        The Holders of Allowed Claims entitled to Distributions hereunder shall be the Beneficiaries of the Liquidating Debtor.  Such Beneficiaries shall be bound by the Plan Administrator Agreement.  The interests of the Beneficiaries in the Liquidating Debtor shall be uncertificated and shall be nontransferable, except upon death of the interest holder or by operation of law.

D.      **Rights, Powers, and Duties of the Liquidating Debtor and the Plan Administrator**

        The Plan Administrator shall have the power and authority to perform the acts described in the Plan Administrator Agreement (subject to approval by the Bankruptcy Court and/or the Oversight Committee where applicable), in addition to any powers granted by law or conferred to it by any other provision of this Combined Joint Plan and Disclosure Statement, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Plan Administrator to act as specifically authorized by any other provision of this Combined Joint Plan and Disclosure Statement, the Plan Administrator Agreement, and/or any applicable law, and to act in such manner as the Plan Administrator may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Plan Administrator or provided herein and to conserve and protect the Liquidating Debtor or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Combined Joint Plan and Disclosure Statement.

        The Liquidating Debtor shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Plan, which for the avoidance of doubt, shall include pursuing (or not pursuing) the Retained Causes of Action and the investigation, prosecution and/or settlement or other disposition of such Retained Causes of Action.  The Plan Administrator shall seek to preserve and protect all applicable privileges of the Liquidating Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) as set forth in more detail in Section IX.M. of the Plan. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Liquidating Debtor and the Estate pursuant to the Plan and the Plan Administrator Agreement (subject to the rights of the Oversight Committee as set forth in Section X.I. hereof and in the Plan Administrator Agreement), shall include, among others:

        a.      receive, manage, invest, supervise, and protect Liquidating Debtor Assets;

        b.      retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Debtor Assets;

        c.      making distributions to Holders of Allowed Claims and Interests as provided for in the Plan;

        d.      administering, reconciling, objecting to, and settling or otherwise litigating to resolution all Claims, including Professional Claims, Administrative

Expense Claims, Secured Claims, Priority Non-Tax Claims, and General Unsecured Claims;

e.    filing tax returns and paying taxes, and challenging disputing, negotiating and resolving the assessment of any of the foregoing by any foreign, domestic, federal, state, local or other taxing authority;

f.    pay Statutory Fees to the extent provided pursuant to Section VI.B. of this Combined Joint Plan and Disclosure Statement;

g.    defending the Debtor and Liquidating Debtor in any litigation, including any governmental litigation(s) and/or investigations against or involving the Debtor or Liquidating Debtor;

h.    prosecution and settlement of the Retained Causes of Action, including but not limited to certain specified Retained Causes of Action to be identified in the Plan Supplement;

i.    maintaining sufficient insurance coverage pending conclusion of the wind-down of the Liquidating Debtor;

j.    dissolving the Liquidating Debtor; and

k.    taking such other actions, or omitting to take such other actions, as the Plan Administrator shall reasonably determine are necessary, advisable or convenient in furtherance of the Plan and the discharge of its duties under the Plan and pursuant to the Plan Administrator Agreement.

## E.    Compensation of the Plan Administrator

The Plan Administrator shall be compensated from the Liquidating Debtor Operating Reserve pursuant to the terms of the Plan Administrator Agreement, as provided in the Liquidating Debtor Operating Budget (as may be modified with the reasonable consent of the Creditors' Committee or the Oversight Committee, as applicable, which consent shall not be unreasonably withheld or by further order of the Bankruptcy Court).  Any professionals retained by the Plan Administrator shall similarly be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Liquidating Debtor Operating Reserve, as provided in the Liquidating Debtor Operating Budget (as may be modified (i) with the reasonable consent of the Creditors' Committee or the Oversight Committee, as applicable, which consent shall not be unreasonably withheld, or (ii) by further order of the Bankruptcy Court).  The payment of the fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; provided, however, that any disputes related to such fees and expenses raised by the Creditors' Committee or the Oversight Committee, as applicable, shall be brought before the Bankruptcy Court.

**F.**    **Indemnification**

        The Liquidating Debtor shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as sole officer, director or member/manager of the Liquidating Debtor), (ii) additional individuals that may serve as officers or members/managers of the Liquidating Debtor, if any, and (iii) the Plan Administrator Advisors (collectively, the "**Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Liquidating Debtor or the implementation or administration of the Plan or the Plan Administrator Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such Indemnified Party is not entitled to be indemnified therefore) out of the Liquidating Debtor Operating Reserve or any available Insurance Contracts, including insurance purchased using the Liquidating Debtor Operating Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent of the Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

**G.**    **Exculpation**

        The organizational documents of the Liquidating Debtor shall provide for the exculpation of the Plan Administrator to the fullest extent permitted by applicable law.

**H.**    **Insurance**

        The Plan Administrator shall be authorized to obtain and pay for out of the Liquidating Debtor Operating Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Liquidating Debtor, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Liquidating Debtor or their Estates and (ii) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator (in consultation with the Oversight Committee) after the termination of the Plan Administrator Agreement.

**I.**    **Oversight Committee**

        1.     As of the Effective Date, a post-confirmation committee to oversee certain actions of the Plan Administrator (the "**Oversight Committee**") shall be formed. The Oversight Committee shall be comprised of five (5) members who shall be identified in the Plan Supplement

and shall include (i) a designee of the Debtor Professionals; (ii) a designee of the Committee Professionals; (iii) a designee of the WARN Act Class Representative on behalf of the WARN Act Claimants; (iv) a designee of CES; and (v) at least one creditor that is a Holder of General Unsecured Claim(s) against the Debtor (or a designee of such Holder of General Unsecured Claim(s) against the Debtor); provided that to the extent that any of the parties listed in (i) through (iv) are paid in full, such party's designee to the Oversight Committee shall be deemed to have automatically resigned from the Oversight Committee.  Upon the death or resignation (or deemed resignation) of a member of the Oversight Committee, other than as a result of having received payment in full of their claims, the remaining members of the Oversight Committee shall fill the applicable vacancy on the Oversight Committee, subject to the reasonable consent of the Plan Administrator, which consent shall not be unreasonably withheld.

After the Effective Date, and until the Oversight Committee is dissolved and discharged, the Plan Administrator shall provide quarterly reports to the Oversight Committee in connection with the wind-down of the Liquidation Debtor and first consult with and obtain the reasonable consent of the Oversight Committee (such consent not to be unreasonably withheld) by majority vote of the Oversight Committee regarding any of the following:

a.    the filing or commencement of any additional Causes of Action (other than objections to Claims or Interests) to the extent not filed or otherwise commenced prior to the Effective Date;

b.    the settlement or resolution of any Claims or Causes of Action to the extent that the Plan Administrator proposes a settlement (including providing for an Allowed Claim) in the amount of $100,000 and above;

c.    the retention of additional Professionals (to the extent not specified in the Plan Administrator Agreement as being retained by the Plan Administrator from and after the Effective Date); and

d.    changes to the Liquidating Debtor Operating Budget (which changes shall, as set forth in Section X.I, be subject to the reasonable consent of the Oversight Committee (such consent not to be unreasonably withheld)).

Additionally, the Plan Administrator will consult with and obtain the reasonable consent of the Oversight Committee (such consent not to be unreasonably withheld) by majority vote with respect to any material issues regarding any tax, regulatory or other governmental filing(s) in connection with the wind-down of the Liquidating Debtor.

2.    Plan Administrator Control/Dispute Resolution: The Plan Administrator shall have complete control over the day-to-day decisions and operations of the Liquidating Debtor except as provided for in Section X.I., elsewhere in the Plan, or in the Plan Administrator Agreement. To the extent that the Oversight Committee and Plan Administrator disagree regarding a proposed action by, or course of conduct for, the Liquidating Debtor falling under Sections X.I.1(a) through (d) above, prior to taking such proposed action or proceeding with such conduct, the matter shall be brought before the Bankruptcy Court on the condition that the party seeking such Bankruptcy Court determination shall certify that the parties met and conferred (or had previously met and

conferred) regarding such proposed action by or course of conduct in good faith and were unable to reach resolution. The Bankruptcy Court shall decide the dispute utilizing such standards and reasoning as the Bankruptcy Court deems appropriate under the circumstances.

3.      Members of the Oversight Committee shall receive no compensation from the Debtor, the Liquidating Debtor or the Plan Administrator on account of their membership on the Oversight Committee except for reimbursement of their reasonable out of pocket expenses (which, for the avoidance of doubt, shall not include the fees or expenses of any professionals retained individually or independently by any member of the Oversight Committee). Upon the earlier to occur of (i) the dissolution of the Liquidating Debtor or (ii) the payment in full of Allowed General Unsecured Claims in Classes 4 and 5 as provided in the Plan, the Oversight Committee shall be automatically disbanded and its members shall have no further duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation.

4.      Indemnification: The Liquidating Debtor shall indemnify and hold harmless (i) the Oversight Committee, its members and the Oversight Committee's Professionals (collectively, the "**OC Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such OC Indemnified Party's willful misconduct or gross negligence, with respect to the Oversight Committee's implementation or administration of the Plan or the Plan Administrator Agreement or its oversight of the Plan Administrator. To the extent an OC Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the OC Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such OC Indemnified Party (and such OC Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such OC Indemnified Party is not entitled to be indemnified therefore) out of the Liquidating Debtor Operating Reserve or any available Insurance Contracts, including insurance purchased using the Liquidating Debtor Operating Reserve. These indemnification provisions shall remain available to and be binding upon any former member of the Oversight Committee or the decedent's estate of any former Oversight Committee member, and shall survive the termination of the Oversight Committee.

5.      Exculpation: The Plan Administrator Agreement shall provide for the exculpation of each OC Indemnified Parties to the fullest extent permitted by applicable law.

## XI.      ADDITIONAL MEANS FOR IMPLEMENTATION

## A.      Preservation of Right to Conduct Investigations

The preservation for the Liquidating Debtor of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Debtor Assets. Accordingly, any and all rights to conduct

investigations pursuant to Bankruptcy Rule 2004 held by the Debtor prior to the Effective Date shall vest with the Liquidating Debtor and shall continue until dissolution of the Liquidating Debtor.

**B.      Effectuating Documents and Further Transactions**

Upon entry of the Plan Confirmation Order, the Debtor and the Plan Administrator shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements, instruments, and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Combined Joint Plan and Disclosure Statement and any transactions described in or contemplated by this Combined Joint Plan and Disclosure Statement.  The Debtor, Liquidating Debtor or Plan Administrator, as  applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to this Combined Joint Plan and Disclosure Statement, at the request or direction of the Debtor, Liquidating Debtor or Plan Administrator, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Combined Joint Plan and Disclosure Statement.

**C.      Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Combined Joint Plan and Disclosure Statement that would otherwise require approval of the directors, officers, members, managers or owners, direct or indirect, of the Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to applicable law, without any further vote, consent, approval, authorization, or other action by such directors, officers, members, managers or owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

**D.      Funding of Liabilities and Distributions**

On the Effective Date, the Debtor and the Debtor's Estate shall transfer the Liquidating Debtor Assets to the Liquidating Debtor to be utilized, administered, and distributed by the Plan Administrator in accordance with the terms and conditions of this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order and the Plan Administrator Agreement.

**E.      Investments of Cash**

The Liquidating Debtor and the Plan Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, provided that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

## F.    Reporting

In no event later than ninety (90) calendar days following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Debtor has been released or paid out in accordance with this Combined Joint Plan and Disclosure Statement, the Plan Administrator shall File a post-confirmation report in the Bankruptcy Court setting forth the amounts, recipients, and dates of all Distributions made by the Plan Administrator under this Combined Joint Plan and Disclosure Statement through each applicable reporting period.

## G.    Release of Liens

Except as otherwise provided in this Combined Joint Plan and Disclosure Statement, or in any contract, instrument, release, or other agreement or document created pursuant to this Combined Joint Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be deemed fully released and discharged without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code or other applicable law.

## H.    Exemption from Securities Laws

Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Debtor under this Combined Joint Plan and Disclosure Statement shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

## I.    Insurance Policies

Nothing in this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, or the Plan Administrator Agreement alters the rights and obligations of the Debtor (and its Estate) and the Debtor's insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies.  All of the Debtor's rights and its Estate's rights under any Insurance Policy to which the Debtor and/or the Debtor's Estate may be beneficiaries shall vest with the Liquidating Debtor for the benefit of the Beneficiaries of the Liquidating Debtor and all of the beneficiaries of such policies.

## J.    Independent Representatives

On the Effective Date, the agreements with the Independent Representatives shall be terminated as of the date thereof.  All amounts due and owing the Independent Representatives shall be paid on the Effective Date and the Independent Representatives shall be released from all obligations to the Debtor.

## K.    Closing of the Chapter 11 Case

When all Liquidating Debtor Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Plan Administrator Agreement and the

Plan Confirmation Order, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

## XII.    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED JOINT PLAN AND DISCLOSURE STATEMENT

### A.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  The Debtor, the Liquidating Debtor or the Plan Administrator shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date.  The Debtor, the Liquidating Debtor the Plan Administrator, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under this Combined Joint Plan and Disclosure Statement only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### B.    Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to this Combined Joint Plan and Disclosure Statement shall be made by check drawn on a domestic bank or an electronic wire transfer.

### C.    Claims Objection Deadline

The Plan Administrator, and any other party in interest to the extent permitted pursuant to section 502(a) of the Bankruptcy Code, shall File and serve any objection to any Claim no later than the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Plan Administrator for cause.

### D.    No Distribution Pending Allowance

Notwithstanding any other provision of this Combined Joint Plan and Disclosure Statement or the Plan Administrator Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Joint Plan and Disclosure Statement or the Plan Administrator Agreement.

### E.    Disputed Claims Reserve

On any date that Distributions are to be made under the terms of this Combined Joint Plan and Disclosure Statement, the Plan Administrator shall establish a reserve of Cash or property (the "**Disputed Claims Reserve**") equal to 100% of the Cash or property that would be

distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property in the Disputed Claims Reserve shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

**F.    Distribution After Allowance**

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) sixty (60) days after the expiration of the Claims Objection Deadline, the Plan Administrator shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder of an Allowed Claim is then entitled.

**G.    Delivery of Distributions**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules if no proof of Claim is Filed and the Plan Administrator has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Plan Administrator as undeliverable, no further Distribution shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution pursuant to Section XII.G. of this Combined Joint Plan and Disclosure Statement.

Until such time as an undeliverable Distribution becomes an Unclaimed Distribution, within thirty (30) days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Plan Administrator shall make Distributions of all Cash and property that has become deliverable during the preceding quarter. Each such Distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such Distribution would have been due had it then been deliverable to the date that such Distribution becomes deliverable.

The Plan Administrator shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; provided, however, nothing contained in this Combined Joint Plan and Disclosure Statement shall require the Plan Administrator to locate any Holder of an Allowed Claim.

**H.    Unclaimed Distributions**

Any Cash or other property to be distributed under this Combined Joint Plan and Disclosure Statement shall revert to the Plan Administrator if it is not claimed by the Holder within ninety (90) days after the date of such Distribution. If such Cash or other property is not claimed

on or before such date, the Distribution made to such Holder shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and may be used for administration of the liquidation of the Debtor.

**I.    Set-Off**

Except as otherwise provided herein, the Debtor, the Liquidating Debtor and Plan Administrator, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtor's books and records.  Rights of a setoff and recoupment of any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action of the Debtor, its Estate, the Liquidating Debtor or the Plan Administrator and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

**J.    Postpetition Interest**

Interest shall not accrue on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

**K.    Distributions After Effective Date**

For Disputed Claims that have not been Allowed as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

**L.    Distributions Free and Clear**

Except as may be otherwise provided in this Combined Joint Plan and Disclosure Statement, all Distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

**M.    Allocation of Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under this Combined Joint Plan and Disclosure Statement comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**N.    Prepayment**

Except as otherwise provided herein or the Plan Confirmation Order, the Debtor, the Liquidating Debtor and the Plan Administrator, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XIII.   EXECUTORY CONTRACTS

All Executory Contracts not previously rejected were rejected pursuant to the Rejection Order.  Notwithstanding the foregoing, to the extent that there are Executory Contracts that have not been rejected, the Plan Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

If the rejection by the Debtor of an Executory Contract, pursuant to the Rejection Order, other Bankruptcy Court Order or this Combined Joint Plan and Disclosure Statement or otherwise, gives rise to a Rejection Damages Claim, a proof of Claim must be filed by the Executory Contract Bar Date.  Any proofs of Claim with respect to a Rejection Damages Claim not filed within such time shall be forever barred from assertion against the Debtor, the Estate, the Liquidating Debtor, the Liquidating Debtor Assets, and their property and such Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Rejection Damages Claims, absent further order of the Bankruptcy Court.  All Rejection Damages Claims will be treated as General Unsecured Claims under this Combined Joint Plan and Disclosure Statement and, to the extent they are deemed Allowed General Unsecured Claims, will receive the treatment afforded Allowed General Unsecured Claims.

## XIV.   INJUNCTION, EXCULPATION AND RELEASES

### A.    Injunction to Protect Estate Assets

**From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims or rights giving rise to any equitable relief against the Debtor or the Assets or any Interests in the Debtor arising prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtor, the Estate, the Liquidating Debtor, the Plan Administrator, or any of their respective property or assets (collectively, the "Estate Assets") on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or proceeding seeking to collect or to recover in any manner against, or assert control or dominion over, the Estate Assets; (b) enforcing, attaching, collecting, or recovering in any manner against the Estate Assets any judgment, award, decree or order; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Estate Assets; and (d) asserting a setoff unless such setoff was formally asserted in a timely Filed proof of claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Plan Confirmation Order or right of subrogation of any kind against any debt, liability, or obligation due to the Debtor, except as otherwise set forth in Section XII.I. of this Combined Joint Plan and Disclosure Statement; provided, however, that such Persons and Entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, or the Plan Administrator Agreement.**

B.      **Term of Injunctions or Stays**

**Unless otherwise provided in this Combined Joint Plan and Disclosure Statement or Plan Confirmation Order, all injunctions or stays provided for under this Combined Joint Plan and Disclosure Statement and ordered in the Plan Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Case, or otherwise, and in existence on the Plan Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Combined Joint Plan and Disclosure Statement or the Plan Confirmation Order, as applicable.**

C.      **Injunction Against Interference with Plan**

**Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, Creditors' Committee's, the Liquidating Debtor's, the Plan Administrator's, and their respective affiliates', employees', advisors', officers', directors', members', managers', and agents' implementation or consummation of this Combined Joint Plan and Disclosure Statement.**

D.      **Exculpation**

**Except as otherwise specifically provided in this Combined Joint Plan and Disclosure Statement, the Exculpated Parties shall not have or incur any liability for any Claim, action, proceeding, Cause of Action, Avoidance Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment arising or accruing on or after the Petition Date, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claim Holder or Interest Holder, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation, solicitation, Filing, and confirmation of this Combined Joint Plan and Disclosure Statement, the pursuit of confirmation of this Combined Joint Plan and Disclosure Statement, the consummation of this Combined Joint Plan and Disclosure Statement, the administration of this Combined Joint Plan and Disclosure Statement, or the property to be liquidated and/or distributed under this Combined Joint Plan and Disclosure Statement, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Combined Joint Plan and Disclosure Statement.**

E.      <u>**Releases**</u>

    1.      **Debtor Releases**

        <u>**Except as may otherwise be expressly provided in this Combined Joint Plan and Disclosure Statement, as of the Effective Date, for good and valuable consideration, to the fullest extent permitted under applicable law, the Released Parties are deemed released and discharged by the Debtor and the Estate of and from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and liabilities (other than the rights of the Debtor to enforce this Combined Joint Plan and Disclosure Statement, and the contracts, instruments, releases, and other agreement or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences, whether direct or derivative, taking place on or prior to the Effective Date in connection with, or related to, the Debtor, and its Estate, other than with respect to Claims, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, gross negligence or willful misconduct.**</u>

    2.      **Holder Releases**

        <u>**Except as may otherwise be expressly provided in this Combined Joint Plan and Disclosure Statement, to the fullest extent permitted under applicable law, unless affirmatively indicated otherwise by checking the "opt out" box on their Ballot or Administrative/Priority Claim Consent Form, Holders of Claims that are entitled to vote on acceptance or rejection of this Combined Joint Plan and Disclosure Statement or consent to the treatment of their Claims hereunder shall be deemed to have released each Released Party of and from all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences, whether direct or derivative, taking place on or prior to the Effective Date in connection with, or related to, the Debtor, the Estate, the 363 Sale Documents, the Chapter 11 Case, and this Combined Joint Plan and Disclosure Statement, other than with respect to the Claims, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, nothing contained in this Section shall impact the right of any Holder of an Allowed Claim to receive a Distribution on account of its Allowed Claim in accordance with this Combined Joint Plan and Disclosure Statement.**</u>

    3.      **Waiver of Statutory Limitations on Releases**

        **Each of the parties providing the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes**

of Action which the releasing party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Combined Joint Plan and Disclosure Statement are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

**F.      Necessity and Approval of Releases and Injunctions**

          The releases, exculpations, and injunctions set forth in Section XII of this Combined Joint Plan and Disclosure Statement are not severable and are integral consideration and critical parts of this Combined Joint Plan and Disclosure Statement, and the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions and exchanging consideration in connection with the Chapter 11 Case and pursuant to this Combined Plan and Disclosure Statement. Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases, exculpations, and injunctions set forth in Section XII of this Combined Joint Plan and Disclosure Statement and shall constitute the Bankruptcy Court's finding that such releases, exculpations, and injunctions are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtor, the Estate, and Creditors; (iii) fair, equitable, and reasonable; and (iv) a bar to any of the releasing parties as set forth in this Combined Joint Plan and Disclosure Statement asserting any Claims or Causes of Action released pursuant to such release.

**G.      Compromise and Settlement of Claims, Interests and Controversies**

          Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Combined Joint Plan and Disclosure Statement, the provisions of this Combined Joint Plan and Disclosure Statement shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.

## XV.    CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE

### A.    Conditions Precedent to Confirmation

Confirmation of this Combined Joint Plan and Disclosure Statement shall not occur, and the Plan Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived:

1.    The Plan Confirmation Order shall be reasonably acceptable in form and substance to the Debtor and the Creditors' Committee.

2.    The Plan Supplement and any other exhibits or schedules incorporated as part of this Combined Joint Plan and Disclosure Statement shall be in form and substance acceptable to the Debtor and the Creditors' Committee.

### B.    Conditions Precedent to the Effective Date

This Combined Joint Plan and Disclosure Statement shall not become effective unless and until the following conditions shall have been satisfied or waived:

1.    Either (a) each Holder of an Allowed Administrative Expense Claim, an Allowed Priority Tax Claim or an Allowed Priority Non-Tax Claim shall have consented or been deemed to consent to receive treatment for its Claim(s) that is different from that set forth in 11 U.S.C. § 1129(a)(9), or (b) the Debtor has received Distributable Assets sufficient to pay all Administrative Expense Claims, Priority Tax Claims and/or Priority Non-Tax Claims in full in cash.

2.    The Plan Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance reasonably acceptable to the Debtor and the Creditors' Committee.

3.    All actions, documents, and agreements necessary to implement this Combined Joint Plan and Disclosure Statement, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Joint Plan and Disclosure Statement, including the Plan Administrator Agreement, shall have been effected or executed.

4.    The absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of any transaction contemplated under this Combined Joint Plan and Disclosure Statement.

5.    The deposit of the Liquidating Debtor Funding Amount into an account held by the Liquidating Debtor in accordance with this Combined Joint Plan and Disclosure Statement.

C.    **Establishing the Effective Date**

   The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions the Effective Date, which date will be selected by the Debtor, after reasonable consultation with the Creditors' Committee.

D.    **Waiver of Conditions to Confirmation and Effective Date**

   Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtor with the written consent of the Creditors' Committee, without notice or an Order of the Bankruptcy Court.

E.    **Effect of Failure of Conditions**

   If each condition to the Effective Date has not been satisfied or duly waived within ninety (90) days after the Plan Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived by the Debtor, with the express written consent of the Creditors' Committee, if applicable, and upon notice to such parties in interest as the Bankruptcy Court may direct, the Plan Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion, the Plan Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtor, with the written consent of the Creditors' Committee, if applicable, before the any Order granting such relief becomes a Final Order.  If the Plan Confirmation Order is vacated pursuant to this Section, this Combined Joint Plan and Disclosure Statement shall be deemed null and void in all respects and nothing contained herein shall (i) constitute a waiver or release of any Claims by or against the Debtor, or (ii) prejudice in any manner the rights of the Debtor.


XVI.    **RETENTION OF JURISDICTION**

   Notwithstanding the entry of the Plan Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement are carried out.  The Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case, this Combined Joint Plan and Disclosure Statement, and the Plan Administrator Agreement for, among other things, the following purposes:

   1.  To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

   2.  To enter and implement such Orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, or vacated;

3.      To issue such Orders in aid of execution and consummation of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement;

4.      To consider any amendments to or modifications of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Plan Confirmation Order;

5.      To hear and determine all requests for compensation and reimbursement of expenses under section 330 or 503 of the Bankruptcy Code;

6.      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement, including the releases, exculpations, and injunctions provided hereunder;

7.      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

8.      To hear any other matter not inconsistent with the Bankruptcy Code;

9.      To enter a final decree closing the Chapter 11 Case;

10.      To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement;

11.      To decide or resolve any motions, adversary proceedings, contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, including, but not limited to, those brought by the Plan Administrator on behalf of the Liquidating Debtor;

12.      To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Combined Joint Plan and Disclosure Statement and the Plan Administrator Agreement;

13.      To approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Plan Administrator or the Liquidating Debtor;

14.      To resolve any dispute or matter arising under or in connection with the Liquidating Debtor, including any request for an extension of the term of the Plan Administrator or the Liquidating Debtor;

15.      To determine any other matters that may arise in connection with  or related to this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the Plan Administrator Agreement, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with this Combined Joint Plan and Disclosure Statement or the Plan Administrator Agreement;

16.     To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

17.     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

18.     To resolve any other matter or for any purpose specified in this Combined Joint Plan and Disclosure Statement, the Plan Confirmation Order, the Plan Administrator Agreement, or any other document entered into in connection with any of the foregoing.

## XVII.  MISCELLANEOUS PROVISIONS

### A.     Amendment or Modification of this Combined Joint Plan and Disclosure Statement

This Combined Joint Plan and Disclosure Statement or any exhibits hereto may be amended, modified, or supplemented by the Debtor, in consultation with the Creditors' Committee, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Plan Confirmation Date, the Debtor, Liquidating Debtor or Plan Administrator, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Combined Joint Plan and Disclosure Statement or the Plan Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Combined Joint Plan and Disclosure Statement. The Debtor may, in consultation with the Creditors' Committee, make appropriate technical adjustments and modifications to this Combined Joint Plan and Disclosure Statement prior to the Effective Date without further order or approval of the Bankruptcy Court.

### B.     Severability

This Combined Joint Plan and Disclosure Statement is not severable. Nevertheless, if, prior to the entry of the Plan Confirmation Order, any term or provision of this Combined Joint Plan and Disclosure Statement is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Combined Joint Plan and Disclosure Statement will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Combined Joint Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**C.**    **Revocation or Withdrawal of this Combined Joint Plan and Disclosure Statement**

   The Debtor, in consultation with the Creditors' Committee, reserve the right to revoke or withdraw this Combined Joint Plan and Disclosure Statement before the Plan Confirmation Date.  If the Debtor revokes or withdraws this Combined Joint Plan and Disclosure Statement before the Plan Confirmation Date, then this Combined Joint Plan and Disclosure Statement shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or the Plan Administrator or to prejudice in any manner the rights of the Debtor or the Plan Administrator in any further proceedings involving the Debtor.

**D.**    **Binding Effect**

   This Combined Joint Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, and the Holders of Interests, and their respective successors and assigns.

**E.**    **Notices**

   All notices to or requests of the Debtor, Liquidating Debtor or Plan Administrator by parties in interest in connection with this Combined Joint Plan and Disclosure Statement shall be in writing and delivered either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery, all charges prepaid, and shall be deemed to have been given when received by:

   If to the Debtor:

     Moore & Van Allen PLLC
     Attn: Hillary Crabtree, Esq.
     100 N. Tryon St., Suite 4700
     Charlotte, NC 28202

   If to the Creditors' Committee:

     Lowenstein Sandler LLP
     Attn: Jeffrey D. Prol, Esq.
     One Lowenstein Drive
     Roseland, NJ 07068

   If to the Plan Administrator:

     Carol Black
     Schletter, Inc.
     5200 77 Center Drive, Suite 250
     Charlotte, NC 28217

**F.**    <u>Governing Law</u>

        Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to this Combined Joint Plan and Disclosure Statement provides otherwise, the rights and obligations arising under this Combined Joint Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of North Carolina, without giving effect to the principles of conflicts of law of such jurisdiction.

**G.**    <u>Withholding and Reporting Requirements</u>

        In connection with the consummation of this Combined Joint Plan and Disclosure Statement, the Debtor and the Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. All Beneficiaries, as a condition to receiving any Distribution, shall provide the Plan Administrator with a completed and executed Form W-9.

**H.**    <u>Headings</u>

        Headings are used in this Combined Joint Plan and Disclosure Statement for convenience and reference only, and shall not constitute a part of this Combined Joint Plan and Disclosure Statement for any other purpose.

**I.**    <u>Exhibits/Schedules</u>

        The Plan Documents are an integral part of this Combined Joint Plan and Disclosure Statement, and are hereby incorporated by reference and made a part thereof.

**J.**    <u>Filing of Additional Documents</u>

        On or before substantial consummation of this Combined Joint Plan and Disclosure Statement, the Debtor, Liquidating Debtor or Plan Administrator, as applicable, shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Joint Plan and Disclosure Statement; provided that the Plan Supplement shall be Filed at least ten (10) days prior to the Plan Confirmation Hearing.

**K.**    <u>No Admissions</u>

        Notwithstanding anything herein to the contrary, nothing contained in this Combined Joint Plan and Disclosure Statement shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**L.**     **Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Joint Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such Person or Entity.

**M.**     **Reservation of Rights**

Except as expressly set forth herein, this Combined Joint Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Plan Confirmation Order.  None of the Filing of this Combined Joint Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Combined Joint Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights or Causes of Action of the Debtor, Holders of Claims, or Holders of Interests before the Effective Date.

**N.**     **Inconsistency**

In the event of any inconsistency among this Combined Joint Plan and Disclosure Statement, the Plan Administrator Agreement, or any other instrument or document created or executed pursuant to this Combined Joint Plan and Disclosure Statement, the provisions of this Combined Joint Plan and Disclosure Statement shall govern; provided that in the event of any inconsistency among this Combined Joint Plan and Disclosure Statement and the Plan Confirmation Order, the provisions of the Plan Confirmation Order shall govern.

**O.**     **Dissolution of the Creditors' Committee**

Upon the occurrence of the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of this Combined Joint Plan and Disclosure Statement, and (iv) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

## XVIII. RISKS AND OTHER CONSIDERATIONS

**A.**     **Bankruptcy Considerations**

Although the Debtor believes that this Combined Joint Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm this Combined Joint Plan and Disclosure Statement as proposed.  Moreover, there can be no assurance that modifications of this Combined Joint Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived.  In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within ninety (90) days after the Plan Confirmation Date, which period may be extended by the Debtor, in consultation with the Creditors' Committee, then the Plan Confirmation Order may be vacated, no Distributions will be made pursuant to this Combined Joint Plan and Disclosure Statement, and the Debtor and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believed that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The projected distributions set forth in this Joint Plan and Disclosure Statement are based upon the Proponents' good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

While the Debtor believed that there are sufficient Liquidating Debtor Assets to make Distributions to Liquidating Debtor Beneficiaries, there can be no assurance that the Liquidating Debtor Assets will be sufficient to pay all Liquidating Debtor Operating Expenses or make Distributions to the Liquidating Debtor Beneficiaries.

While the Proponents believe the Plan is confirmable under the standards set forth in Section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree.

## B.    No Duty to Update Disclosures

The Debtor has no duty to update the information contained in this Combined Joint Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an Order of the Bankruptcy Court.  Delivery of this Combined Joint Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

C.    **Alternatives to Confirmation and Consummation of the Plan**

　　1.    **Alternate Plan**

　　　　If this Combined Joint Plan and Disclosure Statement is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan. Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance). The Debtor believes that this Combined Joint Plan and Disclosure Statement provides for an orderly and efficient liquidation of the Debtor's remaining assets and enables creditors to realize the best return under the circumstances.

　　2.    **Chapter 7 Liquidation**

　　　　If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Case may be converted to liquidation cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that such a liquidation would result in smaller distributions being made to the Creditors than those provided for in this Combined Joint Plan and Disclosure Statement in light of the (a) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation. Further, any distribution is likely to be delayed due to the time necessary to bring the Trustee and his or her advisors "up to speed" and the absence of certain deadlines imposed by the Plan.

D.    **Certain Federal Tax Consequences**

　　　　**Creditors are hereby advised that any discussion of U.S. federal tax issues contained or referred to in this Combined Joint Plan and Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on a taxpayer under the Internal Revenue Code. Such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein. Creditors should seek advice based on their particular circumstances from an independent tax advisor.**

　　1.    **General**

　　　　In general, the following discussion summarizes certain material U.S. federal income tax consequences to Creditors. This discussion is based on current provisions of the IRC, applicable Treasury Regulations thereunder, judicial authority and current administrative rulings and pronouncements of the IRS. There can be no assurance that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

　　　　Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such

changes or interpretations may or may not be retroactive and could affect the tax consequences to the Creditors, the Liquidating Debtor, or the Debtor.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a Creditor may vary depending upon such Creditor's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Creditor, including any alternative minimum tax consequences and does not address the tax consequences to a Creditor that has made an agreement to resolve its claim in a manner not explicitly provided for in this Combined Joint Plan and Disclosure Statement.  This summary also does not address the U.S. federal income tax consequences to Creditors subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Creditors that have a "functional currency" other than the United States dollar and Creditors that have acquired Claims in connection with the performance of services.  The following summary assumes that each Creditor is a "U.S. person," as defined in Section 7701(a)(30) of the IRC, the Claims are held by Creditors as "capital assets" within the meaning of section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Creditors and the character, amount, and timing of income, gain, or loss recognized as a consequence of this Combined Joint Plan and Disclosure Statement and the distributions provided for hereby may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim and whether the Creditor receives Distributions hereunder in more than one taxable year; (iii) whether the Creditor is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Creditor acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Creditor has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Creditor; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Creditor.  Therefore, each Creditor should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Creditor of the transactions contemplated by this Combined Joint Plan and Disclosure Statement.

**The following discussion is intended only as a summary of certain U.S. federal tax consequences of this Combined Joint Plan and Disclosure Statement and is not a substitute for careful tax planning with a tax professional.  The following discussion is for information purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances.  Accordingly, each Creditor is strongly urged to consult its tax advisor regarding the U.S. federal, state,**

local, and applicable non-U.S. income and other tax consequences of this Combined Joint
Plan and Disclosure Statement.

       2.       **U.S. Federal Income Tax Consequences to the Debtor and the Liquidating
Debtor**

       In general, if there is a discharge of a debt obligation by a debtor for an amount less
than the adjusted issue price (in most cases, the amount the debtor received on incurring the
obligation, with certain adjustments), such discharge would give rise to cancellation of
indebtedness income, which must be included in the debtor's income (or, in the case of a debtor
that is treated as a disregarded entity for U.S. federal income tax purposes, in the income of its
owner).  However, the Debtor should be able to utilize an exception to this rule that provides that
gross income does not include discharge of indebtedness income if the discharge occurs in a
Chapter 11 case.  As a result, the Debtor may not recognize income as a result of the discharge of
debt pursuant to this Combined Joint Plan and Disclosure Statement.  One consequence of this
exclusion is that the Debtor generally will be required to reduce certain specified "tax attributes"
by the amount excluded from gross income under this exception.  It is unclear whether the Debtor
or the Liquidating Debtor will incur any taxable income as a result of the collection upon any
assets subsequent to the confirmation of the Plan.

       3.       **U.S. Federal Income Tax Consequences to Holders of Certain Claims**

       a.       <u>Gain or Loss</u>

       The U.S. federal income tax consequences to a Holder of a Claim receiving, or
entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of
factors, including the nature of the Claim, the Holder's method of tax accounting, and the Holder's
own particular tax situation.

       Because the Claims and each Holder's tax situation differ, Holders of Claims
should consult their own tax advisors to determine how the Plan affects them for U.S. federal,
state, local, and non-U.S. tax purposes, based on their particular tax situations. Among other things,
the U.S. federal income tax consequences of a payment to a Holder of a Claim may depend initially
on the nature of the original transaction pursuant to which the Claim arose.

       The U.S. federal income tax consequences of a transfer to a Holder of a Claim may
also depend on whether the item to which the payment relates has previously been included in the
gross income of the Holder or has previously been subject to a loss or a worthless security or bad
debt deduction.  For example, if a payment is made in satisfaction of a receivable acquired in the
ordinary course of a Holder's trade or business, the Holder had previously included the amount of
such receivable payment in its gross income under its method of tax accounting, and had not
previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt
of the payment should not result in additional income to the Holder of a Claim but may result in a
loss.  Conversely, if the Holder of a Claim had previously claimed a loss or worthless security or
bad debt deduction with respect to the item previously included in income, the Holder generally
would be required to include the amount of the payment in income.

A Holder of a Claim receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (a) the amount of Cash, and (b) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  The character of any income or loss that is recognized will depend upon a number of factors, including the status of the Holder of a Claim, the nature of the Claim in the hands of the Holder, whether the Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Claim, and the Holder of a Claim's holding period of the Claim.  Each Holder of a Claim should consult its own tax advisor to determine the character of any gain or loss recognized by such Holder of a Claim. Holders of Claims who were not previously required to include any accrued but unpaid interest on a Claim in their gross income may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest.  Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Whether such losses qualify as ordinary losses under the Tax Code is unclear.  It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

      b.    <u>Market Discount</u>

The market discount provisions of the Tax Code may apply to Holders of Claims. Generally, if a Holder of a Claim purchased the Claim at a price less than such Claim's principal amount, the difference would constitute "market discount" for federal income tax purposes.  In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  Any gain recognized by such a Holder on the receipt of Cash in respect of its Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

      **4.**    **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtor intends to take the position that, for income tax purposes, such distribution shall be allocated to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.  No assurances can be made in this regard.  If, contrary to the Debtor's intended position, such a distribution were treated as being allocated first to accrued but unpaid interest, a Holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realized a loss as a result of the Plan. Conversely, a Holder generally would recognize a deductible loss to the extent that any accrued

interest was previously included in its gross income and was not paid in full. To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

> 5. **Information Reporting and Backup Withholding**

Certain payments, including the payments with respect to Claims or Interests pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, a Holder of a Claim or Interest may be subject to "backup withholding" at the applicable rate. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against U.S. federal income tax liability, and a Holder of a Claim or Interest may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Each Holder of a Claim or Interest is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

> 6. **Importance of Obtaining Professional Tax Assistance**

The foregoing discussion is intended only as a summary of certain tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. Accordingly, Holders of Claims are urged to consult their tax advisors about the federal, state and local, and applicable foreign income and other tax consequences of the Plan.

## XIX.  <u>RECOMMENDATION AND CONCLUSION</u>

The Debtor and the Creditors' Committee believe that this Combined Joint Plan and Disclosure Statement is in the best interests of the Estate and urge the Holders of Impaired Claims entitled to vote to accept this Combined Joint Plan and Disclosure Statement and to evidence such acceptance by properly voting and timely returning their ballots.

This 11th day of September, 2020

| | |
|---|---|
| **MOORE & VAN ALLEN PLLC** | **JD THOMPSON LAW** |
| /s/ Hillary Crabtree | /s/ Linda W. Simpson |
| Hillary B. Crabtree | Linda W. Simpson |
| N.C. State Bar No. 26500 | N.C. State Bar No. 12596 |
| MOORE & VAN ALLEN PLLC | P.O. Box 33127 |
| 100 North Tryon Street, Suite 4700 | Charlotte, North Carolina 28223 |
| Charlotte, North Carolina 28202 | Telephone: (704) 641-4359 |
| Telephone: (704) 331-3571 | Telecopy: (704) 943-1152 |
| Telecopy: (704) 339-5968 | Email: lws@jdthompsonlaw.com |
| Email: hillarycrabtree@mvalaw.com | |
| | *-and-* |
| *Attorneys for Debtor and Debtor in Possession* | **LOWENSTEIN SANDLER LLP** |
| | /s/ Jeffrey D. Prol |
| | Jeffrey D. Prol |
| | One Lowenstein Drive |
| | Roseland, New Jersey 07068 |
| | Telephone: (212) 262-6700 |
| | Telecopy: (212) 262-7402 |
| | *Attorneys for the Official Committee of Unsecured Creditors* |

## **EXHIBIT A**

Liquidating Debtor Operating Reserve

| | |
|---|---|
| Estimated Plan Administrators fees and expenses | $30,000.00 |
| Solvency report needed for litigation | $52,000.00 |
| Post-effective date counsel retainer | $25,000.00 |
| | |
| Total | $107,000.00 |

## EXHIBIT B

## Liquidation Analysis and Best Interests of the Creditors Test

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date.

A hypothetical Chapter 7 liquidation analysis prepared by the Debtor (the "Liquidation Analysis") is attached as Exhibit B.  As is evident from the Liquidation Analysis, the Debtor believes that Creditors have and will continue to clearly benefit from the liquidation under chapter 11 of the Bankruptcy Code and that the value of any distribution from the liquidation proceeds to each Class of Allowed Claims in a Chapter 7 case would be less than the value of distributions under the Plan as such distributions, in a Chapter 7 case, may not occur for a substantial period of time.  In other words, the Debtor has determined that confirmation of the Plan will provide each creditor with a recovery that is not less than it would receive pursuant to a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

Had the Assets been liquidated by a Chapter 7 trustee, the Debtor projects that the maximum recovery would have been substantially less.  The Debtor has realized a greater return than a Chapter 7 trustee would have obtained on the sale of its Assets, specifically due to the Debtor's familiarity with the Assets and its ability to negotiate the highest and best price for the sale.

Converting the Chapter 11 case to a Chapter 7 liquidation at this stage of the wind-down would result in an immense waste of the Debtor's resources that were already expended in connection with the sale of the Assets.  It would also result in substantial additional claims against the Estate. If the Plan is not confirmed, the settlement of the WARN Act litigation will not be effective and any Chapter 7 trustee will be saddled with the WARN Act litigation.

The Committee worked with the Debtor to negotiate with the WARN Act Plaintiffs and successfully reached a global settlement among the Debtor, the Committee, and the WARN Act Plaintiffs pursuant to which the WARN Act Plaintiffs claims were fixed in number, amount and priority, and the parties agreed to a formula to share the proceeds from litigation against the Directors and Officers.

The WARN Act Settlement embedded in the Plan is the fair and equitable result of good faith and arm's length discussions between the Debtor, the Creditors' Committee and the WARN Act Plaintiffs.  In reaching the WARN Act Settlement, the Debtor considered (a) the probability of success and risk of loss of litigating the WARN Act claims, (b) the complexity of the litigation, and (c) the enormous expense, inconvenience, and delay attendant to the litigation.  Based on the facts and circumstances of the Chapter 11 case, the Debtor believes the WARN Act Settlement embedded in the Plan is fair, equitable, and reasonable, clearly falls within the range of litigation possibilities, and is in the best interests of the Debtor, its Estate, its creditors, and other parties in interest.

The WARN Act Settlement eliminates the need to litigate the complex WARN Act issues and avoids the very real prospects that the attendant cost and delay could render the Debtor's Estate administratively insolvent.  These savings are reflected in the proposed Plan rather than consumed in expensive and highly uncertain legal battles.  The implementation of the WARN Act Settlement is a critical Plan mechanism for the benefit of all creditors.

Conversion to chapter 7 could result in expensive and time-consuming litigation over the nature, amount, and priority of the WARN Act plaintiff claims.  As a result, conversion of this case to Chapter 7 would likely prolong the case, delay distributions to creditors, and result in far greater Administrative Expense Claims.  This alone could erode any potential recovery for Holders of Unsecured Claims.

In addition, although the Debtor has already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the statutory fee payable to the Chapter 7 trustee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of money disbursed or turned over by the Chapter 7 trustee.  Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors. Professionals of the Chapter 7 trustee, including legal counsel, a financial advisor and an accountant, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtor.  Moreover, the Chapter 7 trustee fees would reduce the Assets available for distribution to the Estate's Creditors from additional recoveries such as preferential payments and the process of successful Estate litigation or settlement.

Moreover, under the Plan, the Debtor will avoid the increased costs and expenses of a Chapter 7 liquidation, including the fees payable to the Chapter 7 trustee and its professionals.  These costs, expenses, fees and other claims that may arise in a Chapter 7 liquidation case would need to be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Chapter 11 priority and unsecured claims.

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in payments being made to Creditors.  Bankruptcy Rule 3002(c) provides that conversion of a Chapter 11 case to Chapter 7 will trigger a new bard date for filing claims against the Estate, and that the new bar date will be more than 90 days after the Chapter 11 case converts.  Not only would a Chapter 7 liquidation delay distribution to Creditors, but it is possible that additional claims that were not asserted in the Chapter 11 case, or were late-filed, could be filed against the Estate.  Reopening the Bar Date in connection with conversion to Chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estate.

There can be no assurance, however, as to values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determination under Section 1129(a)(7) of the Bankruptcy Code.

## Liquidation Analysis

The hypothetical Liquidation Analysis shows the Debtor's estimate of the potential recovery for General Unsecured Creditors under the Plan versus if the Chapter 11 case was converted to a Chapter 7.  In both instances, the Liquidation Analysis presents 3 potential recovery scenarios:  (1) assumes no litigation recoveries;
(2) assumes litigation recoveries total $2.5 million; and
(3) assumes litigation recoveries total $4.5 million.

The Cash Available Before Wind-down Costs would be the same in a Chapter 11 and Chapter 7 liquidation.  Under these three scenarios, the Cash Available would be approximately $340,000 $2,090,000, or $3,490,000, based on Scenario (1), Scenario (2), and Scenario (3), respectively.

Chapter 11 Plan:
$107,000 of estimated Chapter 11 wind-down costs for the Plan Administrator and Chapter 11 professionals have been reserved.  After deducting these costs, the Net Cash Available for Distribution in the Plan is estimated to be approximately $228,125, $1,944,600, or $3,324,600, based on Scenario (1), Scenario (2), and Scenario (3), respectively.  If no litigation recoveries were received Scenario (1), then all the proceeds would be used to cover Chapter 11 administrative claims and there would be no recovery on priority and unsecured claims.

Under Scenario (2) or Scenario (3), the funds available to pay General Unsecured Creditors would range from approximately $545,000 to $1,245,000 resulting in distributions of 3.3% to 7.5%.

Chapter 7 Scenario:
The estimated Chapter 7 wind-down costs range from $75,000 (for no recovery from the D&O litigation) to $300,000.  After deducting these costs, the Net Cash Available for Distribution in the Plan is estimated to be approximately $221,929, $1,699,600, or $3,079,600, based on Scenario (1), Scenario (2), and Scenario (3), respectively.

Without the proposed WARN Act settlement and the professionals fee agreements, the administrative fees would exceed $3,200,000 based on asserted claims.  As a result, under any scenario, no funds would be available for priority or unsecured creditors.

The Liquidation Analysis shows that if no litigation recoveries were received, then in both a Chapter 11 or Chapter 7 scenario, all the proceeds would be used to cover Chapter 11 administrative claims and there would be no recovery on priority and unsecured claims.

Under the Chapter 11 Plan, General Unsecured Creditors would likely receive a recovery if the gross litigation recoveries, whereas it is estimated there would be no recovery for General Unsecured Creditors in a Chapter 7.

**SCHLETTER INC.**
**LIQUIDATION ANALYSIS**
**Chapter 7**

| ESTIMATED ASSETS | | ESTIMATED VALUES AND CLAIMS | ESTIMATED RECOVERY VALUE NO OTHER RECOVERIES | ESTIMATED RECOVERY %' | ESTIMATED RECOVERY VALUE $2,500,000 OTHER RECOVERIES | ESTIMATED RECOVERY %' | ESTIMATED RECOVERY VALUE $4,500,000 OTHER RECOVERIES | ESTIMATED RECOVERY %' |
|---|---|---|---|---|---|---|---|---|
| Cash | 1 | $ 340,000.00 | $ 340,000.00 | | $ 340,000.00 | | $ 340,000.00 | |
| Other Recoveries | 2 | $0 - $5,000,000 | $ - | | $ 2,500,000.00 | | $ 4,500,000.00 | |
| **Total Assets** | | | $ 340,000.00 | | $ 2,840,000.00 | | $ 4,840,000.00 | |
| Less: Contingency Litigation Fee | 3 | 30 percent of Other Recoveries | $ - | | $ 750,000.00 | | $ 1,350,000.00 | |
| Cash Available Before Wind-down costs | | | $ 340,000.00 | | $ 2,090,000.00 | | $ 3,490,000.00 | |
| **ESTIMATED CLAIMS** | | | | | | | | |
| Chapter 7 Trustee Administrative Claims | 4 | $ 75,000.00 | $ 75,000.00 | 100% | $ 300,000.00 | 100% | $ 300,000.00 | 100% |
| Solvency report and D&O Retainer | | $ 62,000.00 | $ 62,000.00 | | $ 62,000.00 | | $ 62,000.00 | |
| Section 1930 Reserves | | | $4,875 | | $ 28,400.00 | | $ 48,400.00 | |
| **Net Cash Available for Distribution** | | | $ 207,875.00 | | $ 1,699,600.00 | | $ 3,079,600.00 | |
| Chapter 11 Administrative Claims | 5 | 3,200,000 | $ 221,929.17 | 7% | $ 1,699,600.00 | 53% | $ 3,079,600.00 | 96% |
| Secured Claims | | $ - | $ - | 100% | $ - | 100% | $ - | 100% |
| Prioirty Claims | 6 | $ 883,899.00 | $ - | 0% | $ - | 0% | $ - | 0% |
| General Unsecured Claims | 6 | $ 16,650,000.00 | $ - | 0% | $ - | 0% | $ - | 0.0% |
| Hynes Unsecured Claim | | $ 950,000.00 | $ - | 0% | $ - | 0% | $ - | 0% |

Notes
1. Amount based on monthly report filed for the month of June, 2020
2. Other Recoveries estimated on assumption chapter 7 trustee will incur the expense to pursue the retained claims and causes
of action. As a result the recover could be anywhere from $0 to $5,000,000 based on insurance limits.
However, on the assumption that there will not be a full $5 million recover, will estimate $4.5 million
3. If chapter 7 trustee pursues causes of actions, estimated 30 percent contingency fee will be required by attorneys.
4. Chapter 7 trustee administrative expense is purely an estimation and in no way reflects possible administrative claims. Assumptions include additional expense for pursuing litigation .
and responding to discovery.
5. The chapter 11 Administrative Claims amount is an estimate of claims assuming no settlement with the WARN litigants and reduction of claims among administrative creditors. The amount
was reduced by $100,000 not to exceed the net cash available for distribution. After this change, the recovery % decreased from 57% to 54%.
6. Estimation of claim amounts based on proofs of claims and Debtor's books and records. Ultimate amount may vary.

**SCHLETTER INC.**
**LIQUIDATION ANALYSIS**
**Chapter 11**

| | | ESTIMATED VALUES AND CLAIMS | ESTIMATED RECOVERY VALUE NO OTHER RECOVERIES | ESTIMATED RECOVERY %' | ESTIMATED RECOVERY VALUE $2,500,000 OTHER RECOVERIES | ESTIMATED RECOVERY %' | ESTIMATED RECOVERY VALUE $4,500,000 OTHER RECOVERIES | ESTIMATED RECOVERY %' |
|---|---|---|---|---|---|---|---|---|
| **ESTIMATED ASSETS** | | | | | | | | |
| Cash | 1 | $ 340,000.00 | $ 340,000.00 | | $ 340,000.00 | | $ 340,000.00 | |
| Other Recoveries | 2 | $0 - $5,000,000 | $ - | | $ 2,500,000.00 | | $ 4,500,000.00 | |
| **Total Assets** | | | $ 340,000.00 | | $ 2,840,000.00 | | $ 4,840,000.00 | |
| Less:  Contingeny Litigation Fee | | 30 percent of Other Recoveries | $ - | | $ 750,000.00 | | $ 1,350,000.00 | |
| Cash Available Before Wind-down costs | | | $ 340,000.00 | | $ 2,090,000.00 | | $ 3,490,000.00 | |
| Chapter 11 Liquidation Reserve | 3 | $ 107,000.00 | $ 107,000.00 | | $ 107,000.00 | | $ 107,000.00 | 100% |
| Liquidation Escrow | 4 | | $ - | | $ 10,000.00 | | $ 10,000.00 | |
| Section 1930 Bankruptcy Administrator Fees | | | $ 4,875.00 | | $ 28,400.00 | | $ 48,400.00 | |
| **Net Cash Available for Distribution** | | | $ 228,125.00 | | $ 1,944,600.00 | | $ 3,324,600.00 | |
| **ESTIMATED CLAIMS** | | | | | | | | |
| Chapter 11 Administrative Claims | 5 | 1,725,000 | $ 228,125.00 | 13% | $ 1,254,600.00 | 73% | $ 1,620,000.00 | 94% |
| Secured Claims | | $ - | $ - | 100% | $ - | 100% | $ - | 100% |
| Priorty Claims | 6 | $ 883,899.00 | $ - | 0% | $ 140,000.00 | 16% | $ 474,600.00 | 54% |
| General Unsecured Claims | 6 | $ 16,650,000.00 | $ - | 0% | $ 550,000.00 | 3.3% | $ 1,250,000.00 | 7.5% |
| Hynes Unsecured Claim | | $ 950,000.00 | $ - | 0% | $ - | 0% | $ - | 0% |
| Total Uses | | | $ 228,125.00 | | $ 1,944,600.00 | | $ 3,344,600.00 | |

Notes
1.  Amount based on monthly report filed for the month of June, 2020
2.  Other Recoveries estimated range of values from 0 to maximum insurance limit of $5,000,000.  However, on the assumption that there will not be a full $5 million recover, will estimate $4.5 million
3.  See Liquidation Budget for explanation of reserve
4.  Liquidation Escrow for anticipated costs of mailing Final Distribution
5.  The chapter 11 Administrative Claims amount is an estimate of claims based upon agreements and settlements between Administrative Creditors
6.  Estimation of claim amounts based on proofs of claims and Debtor's books and records.   Ultimate amount may vary.